**PEOPLE FOR the ETHICAL TREATMENT OF ANIMALS, INC., Plaintiff,**

v.

**Charlene BARSHEFSKY, Acting U.S. Trade Representative, et al., Defendants.**

No. CA–96–1013.

United States District Court, D. Columbia.

May 17, 1996.

---

John F. Cobau, Patton Boggs, L.L.P., Washington, DC, for Plaintiff.

Eric Goulian, U.S. Department of Justice, Civil Division, Washington, DC, for Defendants.

## MEMORANDUM OPINION

URBINA, District Judge.

This matter comes before the court upon plaintiff's motion for a preliminary injunction and defendants' opposition. The issue before the court is whether a working group composed of experts from various countries that is seeking to develop international humane trapping standards is subject to the requirements of the Federal Advisory Committee Act, 5 U.S.C.App., §§ 1–14 (FACA). The court concludes that plaintiff has not demonstrated a substantial likelihood of succeeding on its claim that the working group was established or is utilized by a federal agency.

As a result, the court, for purposes of this motion, concludes that the working group is not subject to FACA. Accordingly, plaintiff's request for injunctive relief must be denied.

## I. Background

On November 4, 1991, the European Union (EU) adopted Regulation No. 3254/91 which bars the use of leghold traps within the EU for certain animal species and prohibits the importation into the EU of pelts of animal species of the type caught in leghold traps unless the exporting country either prohibits the use of these traps or complies with an internationally agreed upon humane trapping standard. The EU banned the leghold traps to aid in the conservation of endangered species and to prevent the prolonged pain an animal suffers as a result of leghold traps. On January 1, 1997, the EU import ban is scheduled to become effective.

The EU regulation would, however, permit fur imports from nations which comply with an international humane trapping standard. The United States, Canada, and Russia have expressed concern over the EU regulation since no international humane trapping standard has been developed and thus exporting countries cannot hope to meet this standard in order to avoid the EU import ban. In an effort to reach some form of accommodation and to avert a serious trade dispute over the EU ban, the United States government has entered into discussions with the European Commission. As part of this engagement, the EU, Canada, and the United States decided to facilitate the formation of a working group of experts to develop an international humane trapping standard. Russia has also joined the group. The members of the working group hope that this standard will influence or help determine how the EU ban is implemented. Each nation selected its representatives to the group.

In the United States, trapping is regulated by the individual states. Consequently, the National Governors Association (NGA) selected three experts from New York, Louisiana, and Wyoming, respectively, to serve on the working group. Included among the members of the U.S. delegation are two other officials: one from the U.S. Department of Agriculture and one from the U.S. Trade Representative's Office. The working group has convened five times since its formation. It has alternated its meetings between North America and Europe. The next meeting is to be held in St. Petersburg, Russia.

Plaintiff, People for the Ethical Treatment of Animals, Inc. (PETA), a non-profit international organization dedicated to protecting animals from exploitation and cruelty, seeks to impose the procedural and substantive requirements of the Federal Advisory Committee Act on the international group of experts who constitute the working group. PETA seeks to be informed about the purpose and activities of the working group and wants to participate in its decision-making process and meetings. Specifically, plaintiff seeks a preliminary injunction to enjoin the defendants from "holding, conducting, attending, or participating in any meetings of the working group on the Development of International Humane Standards, or otherwise supporting any such meetings,"[1] until the defendants comply with the requirements of the Act.

## II. Analysis

In order to succeed on a motion for a preliminary injunction, a movant must demonstrate: (1) a substantial likelihood of success on the merits; (2) that irreparable injury will result in the absence of the requested relief; (3) other interested parties will not suffer substantial harm if the injunction is granted; and (4) that the public interest favors entry of a preliminary injunction. *WMATC v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C.Cir.1977); *Sea Containers, Ltd. v. Stena AB*, 890 F.2d 1205, 1208 (D.C.Cir. 1989). A preliminary injunction is not granted as a matter of right. *Eli Lilly and Co. v. Premo Pharmaceutical Labs.*, 630 F.2d 120, 136 (3d Cir.1980), *cert. denied*, 449 U.S. 1014, 101 S.Ct. 573, 66 L.Ed.2d 473 (1980). Injunctive relief is an extraordinary remedy and must be sparingly granted. *Dorfmann v. Boozer*, 414 F.2d 1168 (D.C.Cir.1969).

---

1. *See* Plaintiff's Proposed Order Granting the Preliminary Injunction.

■ A district court is to balance the four factors. *Grigsby Brandford & Co., Inc. v. U.S.,* 869 F.Supp. 984, 1003 (D.D.C.1994). Consequently, although a "particularly strong likelihood of success on the merits" may entitle a movant to relief upon "a relatively slight showing of irreparable injury," some showing of irreparable injury is always required, "since 'the basis for injunctive relief in the federal court has always been irreparable harm.'" *CityFed Fin. Corp. v. OTS,* 58 F.3d 738, 747 (D.C.Cir.1995) (*quoting Sampson v. Murray,* 415 U.S. 61, 88, 94 S.Ct. 937, 951, 39 L.Ed.2d 166 (1974)). Likewise, a court may accept a showing that the movant has a "substantial case on the merits" instead of the probability of success on the merits that is ordinarily required, but only when all of "the other three factors strongly favor interim relief." *Holiday Tours, Inc.,* 559 F.2d at 843.

## A. Likelihood of Success on the Merits

The Federal Advisory Committee Act (Act) was enacted in 1976 with Congress' recognition that many committees, boards, commissions, and other groups provide the executive branch with valuable expert advice, ideas and opinions. *See* 5 U.S.C.App. 2 § 2(a). However, Congress was also cognizant of the fact that many advisory committees were created without adequate justification. *Id.* 2 §§ 2(b)(1)–(3). Those committees that were necessary should be accessible to the Congress and the public. *Id.* 2 § 2(b)(5). The statute has two principal purposes: "to enhance the public accountability of advisory committees established by the Executive Branch and to reduce wasteful expenditures on them." *Public Citizen v. United States Dep't of Justice,* 491 U.S. 440, 459, 109 S.Ct. 2558, 2568, 105 L.Ed.2d 377 (1989). Finally, the function of advisory committees is to be advisory in nature only; with the final decision on all matters resting with the appropriate executive branch agency or official. 5 U.S.C.App. 2 § 2(b)(6).

For purposes of the Act, an advisory committee is

... any committee, board, commission, council, conference, panel, task force, or other similar group, or any subcommittee or other subgroup thereof ... which is ... (A) established by statute or reorganization plan, or (B) established or utilized by the President, or (C) established or utilized by one or more agencies, in the interest of obtaining advice or ·recommendations for the President or one or more agencies or officers of the Federal Government ...

*Id.* 2 § 3(2). Therefore, in order to constitute a committee under the Act, a group must be established or utilized by the President or an executive agency for the purpose of obtaining advice or recommendations. An advisory committee which comes under the terms of the Act must comply with a number of detailed requirements. *See id.* 2 §§ 9–10.[2]

■ Presently, however, plaintiff has not demonstrated a substantial likelihood of succeeding on the merits of its claim that the working group at issue in this case was either established or utilized by the USTR and is thereby subject to the terms of the Act. PETA asserts that the U.S. government, through the USTR, established the working group to provide the USTR with advice on international humane trapping standards. Plaintiff bases its argument on the fact that the USTR, in its 1996 Trade Barriers Report, stated that, "at the urging of the U.S. Government and others, experts from the European Commission, Canada and the United States (later joined by Russia) launched an intensive discussion of humane trapping standards." Furthermore, plaintiff states that the USTR was responsible for naming some of the members of the working group. According to PETA, because federal and non-federal officials are members of the working group and because the U.S. government provides some of the funding for the working group, the group is an advisory committee under the terms of the Act. Finally, plaintiff maintains that the working group

---

**2.** The Act requires that an advisory committee file a charter, § 9(c); have members who are "fairly balanced in terms of the points of view represented and the functions to be performed," § 5(b)(2); give advance notice of its meetings, which shall be open to the public, § 10(a)(1) & (2); and keep minutes of its meetings, § 10(c), which, along with reports and records, are to be available to the public unless excepted under the Freedom of Information Act, § 10(b).

provides the USTR with advice on international humane trapping standards.

The USTR, for its part, contends that the working group is not an advisory committee within the meaning of the Act because the working group does not have an advisory function. Rather, it is a group of experts that is seeking to develop certain international guidelines with respect to humane trapping; not to provide advice. In addition, the defendants maintain that the Act does not apply to the working group because the group was established, not by the USTR, but through the cooperative efforts of the United States, Canada and the EU. Finally, the defendants aver that they do not utilize the working group as that term is employed by the Act.

■ As this juncture, the court cannot conclude that the working group was established by the USTR. In order for a committee to be established by an agency, it must be 'directly established' by the agency. *Lombardo v. Handler,* 397 F.Supp. 792, 797 (D.D.C.1975), *aff'd,* 546 F.2d 1043 (D.C.Cir. 1976), *cert. denied,* 431 U.S. 932, 97 S.Ct. 2639, 53 L.Ed.2d 248 (1977) (internal citations omitted). Moreover, a liberal interpretation of the word 'establish' was expressly rejected by the Conference Committee responsible for the ultimate bill that became law. *Id.* (internal citations omitted). There are several indications in this case that point to the conclusion that the working group was not directly established by the USTR. The working group was formed with the cooperation of the U.S., Canada, the EU and later Russia. Each party was responsible for naming its representatives to the group.

Trapping in the United States is regulated by the individual states. As a result, the greater number of individuals that constitute the U.S. delegation were selected by the National Governors Association; apparently without input from any federal agency. In fact the individuals named by the NGA are employed by state agencies. There are only two individuals that are members of the U.S. delegation and work for federal agencies: one official from the U.S. Department of Agriculture's Animal and Plant Health Inspection Service and one USTR official who serves in a non-substantive capacity. Thus only one federal official is involved in a substantive role.

The meetings are held in Europe and North America, with the host country providing for logistical arrangements. Furthermore, each participating party assumes responsibility for the costs associated with the meetings. The respective state and federal agencies cover the expenses for the members of the U.S. delegation. Thus the working group appears to have been formed at the behest of an international constituency, not the President or a federal agency. The mere fact that the USTR has indirectly facilitated the formation of the group does not rise to the level necessary for this court to conclude that the USTR "directly established" the working group.

■ Similarly, the court cannot presently conclude that the plaintiff has a substantial likelihood of success on the merits of its claim that the USTR or any other federal agency utilizes the working group as that term is employed by the Act. In order to establish that the defendants *utilized* the working group, plaintiff must show "something along the lines of actual management or control of the advisory committee." *Sofamor Danek Group, Inc. v. Gaus,* 61 F.3d 929, 936 (D.C.Cir.1995) (*quoting Washington Legal Foundation v. United States Sentencing Comm'n,* 17 F.3d 1446, 1450 (D.C.Cir.1994)).

The working group is composed of officials from other countries over which the U.S. Government exercises no control. Each participating country is financially responsible for its delegation. Moreover, even with respect to the members of the U.S. delegation, most are directly responsible to state agencies, not federal entities. In addition, the host country is responsible for the logistical details of the meetings. Finally, plaintiff has not presented any evidence which would lead to the conclusion that the working group advises or makes recommendations to any federal agency. The working group has the authority to independently develop humane trapping standards and therefore it does not appear to be advisory in nature. These standards may or may not be used by the EU in

implementing Regulation 3254/91. However, the USTR is not developing any standard that pertains to humane trapping methods, as such it is not soliciting any advice on how to develop one. It is the international group of experts which is developing the standard independent of any federal agency. Consequently, based on the record before it, this court cannot presently conclude that the USTR or any other federal agency has the requisite authority over the working group to implicate the Act's requirements.

## B. Irreparable Harm, Balance of Harms, and the Public Interest

 "Irreparability of injury is a very high standard." *American Coastal Line Joint Venture, Inc. v. United States Lines, Inc.,* 580 F.Supp. 932, 936 (D.D.C.1983). Plaintiff's irreparable harm is premised on the alleged injury it will suffer if it is denied access to the meetings. This injury will take the form of being denied rights granted it by the Act. However, as discussed above, the plaintiff has not preliminarily demonstrated that it is the beneficiary of any rights granted by the Act. In addition, even if the court were to grant plaintiff's request for a preliminary injunction, the meeting in St. Petersburg would go on as planned. This court could not enjoin the participants from the other countries from attending the meeting. The U.S. delegation, however, would not be permitted to attend. Plaintiff would not be able to, through its request for injunctive relief, force the other participants to share any information and would not be entitled to participate in the meeting.[3]

 Additionally, the balance of harms and the public interest weigh against the granting of injunctive relief in this case. If the court were to grant plaintiff's request, the effect would be to prevent the U.S. delegation from attending the meeting in St. Petersburg, Russia. However, there is no indication that the meeting would be canceled. On the contrary, it appears that the meeting would proceed as scheduled. Thus, the result would be that the meeting would go forward without the participation of the U.S. delegation thereby diminishing its ability to contribute to the development of internationally agreed upon humane trapping standards. Finally, even if this court were to impose the Act's requirements upon the meeting, it could not force the delegations of the other participating countries to comply with the same.

Accordingly, pursuant to this court's order dated May 10, 1996, plaintiff's motion is **denied.**

---

3. The cases relied upon by the plaintiff to establish irreparable harm are inapposite. In those cases, the committee was established or controlled by the U.S. government. It was thus within the power of the U.S. government to grant the plaintiff in those cases access to the committee meetings. *See Association of American Physicians and Surgeons v. Clinton,* 813 F.Supp. 82 (D.D.C.1993), *rev'd on other grounds,* 997 F.2d 898 (D.C.Cir.1993); *Public Citizen v. National Economic Comm'n.,* 703 F.Supp. 113 (D.D.C. 1989); *Gates v. Schlesinger,* 366 F.Supp. 797 (D.D.C.1973). Presently, the working group is not under the control of any U.S. federal agency and thus even if the court were to grant plaintiff the requested relief, plaintiff would not be entitled to attend the meetings of the working group.