**PHYSICIANS COMMITTEE FOR RESPONSIBLE MEDICINE,**
**et al. Plaintiff(s)**

**v.**

Marianne Lamont HORINKO, Acting Administrator, United States Environmental Protection Agency Defendant(s).

**No. 02 CIV. 7049 LTS KNF.**

United States District Court,
S.D. New York.

Oct. 6, 2003.

Mindy S. Kursban, Physicians Committee for Responsible Medicine, Washington, DC, Susan L. Hall, People for the Ethical Treatment of Animals, Norfolk, VA, Robert S. Friedlander, New York, for Plaintiffs.

James B. Comey, United States Attorney for the Southern District of New York, By Sean H. Lane, Esq., Assistant United States Attorney, New York City, for Defendant.

## AMENDED OPINION AND ORDER

SWAIN, District Judge.

This Amended Opinion and Order, issued on October 6, 2003, supersedes the Court's Opinion and Order, dated August 25, 2003, in this case.

Before the Court are cross-motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Plaintiffs Physicians Committee for Responsible Medicine ("PCRM"), People for the Ethical Treatment of Animals ("PETA"), American Anti–Vivisection Society ("AAVS"), Alternatives Research & Development Foundation ("ARDF"), Rosa Naparstek, Scott Mishler and John Gentry (collectively, "Plaintiffs") seek judgment as a matter of law on their claims arising from the involvement of defendant United States Environmental Protection Agency ("EPA" or "Defendant") in a voluntary testing program designed to generate toxicity data on some 2,800 high production volume ("HPV") chemicals. In their two-count complaint, Plaintiffs allege that Defendant violated the Toxic Substances Control Act ("TSCA"), 15 U.S.C.A. §§ 2601–2629, by implementing a voluntary testing program ("HPV Challenge Program") rather than promulgating a formal test rule via notice-and-comment rulemaking in accordance with the requirements of Section 4 of TSCA, 15 § U.S.C.A. 2603. Plaintiffs also allege that Defendant violated Sections 3, 5, 9 and 10 of the Federal

Advisory Committee Act ("FACA"), 5 U.S.C.A.App. 2, by meeting with representatives of the Chemical Manufacturers Association ("CMA") and the Environmental Defense Fund ("EDF") as part of the process of developing and implementing the HPV Challenge Program. Plaintiffs argue that such meetings amounted to the establishment and/or utilization of an "advisory committee" and that, as a result, Defendant violated FACA by not complying with the statute's public participation and accountability requirements.

Plaintiffs seek an order enjoining Defendant from continuing to implement the HPV Challenge Program, a declaratory judgment that Defendant violated Section 4 of TSCA and Sections 3, 5, 9 and 10 of FACA, and, in the event the Court is not inclined on the evidence presented to grant Plaintiffs' motion with respect to their FACA claim, an order compelling Defendant to produce to Plaintiffs certain documents and information related to Plaintiffs' FACA claim that were not previously provided.

Defendant opposes Plaintiffs' motion and has filed a cross-motion for summary judgment, arguing that the Court lacks subject matter jurisdiction of Plaintiffs' claims under TSCA because the statute's citizen suit provision only authorizes civil actions brought to compel the EPA Administrator to perform a duty which is not discretionary. Defendant argues that it was not required to promulgate formal test rules because it did not make the findings necessary to trigger TSCA's mandatory rulemaking provisions. Defendant also contends that it is entitled to summary judgment on the merits of Plaintiffs' FACA claim because it did not establish or utilize an advisory committee within the meaning of FACA and, therefore, was not under any duty to comply with FACA's provisions. Finally, Defendant argues

that Plaintiffs have not satisfied their burden for obtaining further discovery pursuant to Fed.R.Civ.P. 56(f).

The Court has considered thoroughly all of the parties' submissions and arguments pertaining to the motions. For the following reasons, Plaintiffs' motion for summary judgment and its request for additional discovery are denied, while Defendant's motion for summary judgment is granted in part and denied in part.

## BACKGROUND

The following facts are undisputed except as specified otherwise. The United States imports or produces approximately 2,800–3,000 non-polymeric, organic chemical substances and mixtures in amounts equal to or greater than 1 million pounds per year. These substances and mixtures are known as high production volume ("HPV") chemicals. (Pl.'s Local Rule 56.1 Statement ("PR56.1") ¶ 1; Declaration of Charles M. Auer, May 2, 2003 ("Auer Decl.") ¶ 39.)

In the late 1980's, the Organization for Economic Cooperation and Development ("OECD"), an international organization of which the United States is a member, implemented the Screening Information Data Set ("SIDS") program, which led to the development of an internationally recognized set of screening tests designed to aid in the gathering of toxicity data on HPV chemicals. Various chemical companies, including several American companies, have engaged in SIDS testing pursuant to the OECD HPV Program. (Auer Decl. ¶¶ 23–25.)

Despite this initiative, however, the environmental group Environmental Defense Fund asserted in a July 1997 report entitled *Toxic Ignorance* that existing knowledge of the potentially harmful effects of a sizeable percentage of the HPV chemicals being released into the environment was

insufficient. (EDF Report, *Toxic Ignorance: The Continuing Absence of Basic Health Testing for Top–Selling Chemicals in the United States* (July 1997)). Based on a study of a sample of HPV chemicals, the report concluded that SIDS data relating to human health hazards were available for only 29% of domestic HPV chemicals. *Id.*

In the aftermath of the report's release, EPA conducted its own analyses and concluded that no publicly available data existed for about 43% of HPV chemicals, while only minimal data existed for most of the remaining chemicals. (Def's Local Rule 56.1 Statement ("DR56.1") ¶ 4). Plaintiffs dispute the accuracy of EPA's findings.

Defendant asserts that, at the time EDF issued its July 1997 report, EDF also issued a formal challenge to 100 chemical companies, asking them to develop health data by the year 2000 on about 3,000 chemicals they manufacture. (Declaration of Larry W. Rampy, April 29, 2003 ("Rampy Decl.") ¶ 5.) According to Defendant, EDF and CMA began discussions relating to EDF's challenge during the summer of 1997. Defendant asserts that EDF and CMA kept Defendant informed about the discussions and invited Defendant to at least one of their meetings. (*Id.* ¶¶ 7–11.) Defendant claims that, as a result of the discussions between EDF and CMA, CMA announced in April 1998 that both the pace of testing as well as the quantity of chemicals to be tested by American companies through the SIDS program would increase sevenfold. (*Id.* ¶ 10.) According to Plaintiffs, it was EPA that requested that CMA increase the pace of testing. (Letter from CMA to People for the Ethical Treatment of Animals, January 8, 1999.)

On Earth Day, April 21, 1998, Vice President Al Gore announced the national "Chemical Right–to–Know" initiative, which is an effort to provide the public with information about the risks associated with those chemicals that are most pervasive in the environment. The program was designed to "accelerate the development and dissemination of public health and environmental testing data," and included a challenge to manufacturers to test all of the 3,000 or so HPV chemicals within a three-year period. (EPA, *Chemical Right–to–Know Program Frequently Asked Questions;* Rampy Decl. ¶ 11.)

According to Defendant, after the launch of the Chemical Right–to–Know initiative, CMA and EDF continued their dialogue regarding the need to generate data on HPV chemicals. Defendant asserts that, in June of 1998, CMA and EDF informed Defendant that they had reached broad agreement on a plan to accelerate the generation of publicly available data on HPV chemicals. (Rampy Decl. ¶ 13; Declaration of David Roe, May 1, 2003 ("Roe Decl.") ¶ 12.) Defendant claims that it informed the organizations that it would be willing to consider their joint proposal, but asserts that it neither directed EDF and CMA to meet nor exerted any influence or control over who attended their meetings. (DR56.1 ¶ 11.) According to Defendant, CMA and EDF worked on a framework for an agreement during the summer of 1998 and communicated the framework to EPA in September 1998. *Id.*

On October 9, 1998, EPA, in cooperation with EDF and CMA, announced the establishment of the HPV Challenge Program, a voluntary toxicity data collection effort. The program is an attempt by EPA to challenge the chemical industry to voluntarily sponsor testing of approximately 2,800 HPV chemical substances or mixtures. (*Id.* ¶¶ 14–15.) In conjunction with its formal announcement of the program, EPA sent a letter to approximately 900 chemical companies inviting them to participate in the endeavor. (PR56.1 ¶ 17.)

Under the program, sponsors are asked to submit to EPA a commitment letter, a "robust summary" of existing data on the particular chemical, and a test plan detailing the manner in which the sponsor expects to fill the gaps, if there are any, in the already existing data (in some cases by performing tests using SIDS protocols). (DR56.1 ¶ 16; EPA, Data Collection and Development on High Production Volume (HPV) Chemicals, 65 Fed.Reg. 81,686, 81,-692 (Dec. 26, 2000)). Chemicals may be sponsored by individual companies as well as by consortia and, under certain circumstances, chemicals and mixtures can be grouped into categories for testing purposes. *Id.* at 81,693–94.

EPA did not issue any public notice pertaining to the development of the HPV Program between the time the Chemical Right–to–Know initiative was announced on April 21, 1998, and the time the HPV Challenge Program was announced on October 9, 1998. (PR56.1 ¶ 9). On May 5, 1999, EPA published its first and only notice announcing public meetings relating to the implementation of the HPV Program. (PR56.1 ¶ 22; High Production Volume Chemical Initiative; Periodic Update Meetings, 64 Fed.Reg. 24,151 (May 5, 1999)). On December 26, 2000, EPA published a notice in the Federal Register detailing the background, purpose, and structure of the HPV Program. The notice provided information on a variety of topics pertaining to the program, including how particular chemicals were chosen for inclusion, what types of information were being collected, the role being played by existing data, and how animal welfare issues were being handled.

The December 26, 2000 notice also explained that the two "commitment" phases of the initiative, during which companies signed on to sponsor particular chemicals, had already been completed, with the first phase having ended on March 15, 1999, and the second phase having ended on December 1, 1999. During the two phases, commitments were garnered from 469 companies to sponsor a total of 2,155 chemicals. (65 Fed.Reg. 81693–94.) As of May 5, 2003, approximately 2,165 chemical substances and mixtures had been sponsored in connection with the HPV Challenge Program. (Auer Decl. ¶ 39.)

The notice also indicated that there were two phases of the HPV Challenge Program: the "voluntary phase," which is described above, and a "regulatory" phase, during which proposed test rules would be promulgated pursuant to Section 4 of TSCA for certain of the HPV chemicals that companies did not sponsor voluntarily. (PR56.1 ¶ 24; 65 Fed.Reg. 81,658, 81,686.) In the December 26, 2000 notice, EPA published a proposed test rule requiring chemical companies to conduct SIDS tests on 37 out of the approximately 600 HPV chemicals not sponsored by companies voluntarily. (PR56.1 ¶ 25; 65 Fed.Reg. 81,-658.)

After formally announcing the HPV Challenge Program in October 1998, EPA conducted a public workshop and held meetings with representatives from a variety of outside groups, including PCRM and PETA, on multiple occasions. (Auer Decl. ¶¶ 42–46.) Plaintiffs PCRM and PETA have been aware of the HPV Challenge Program since November 1998. During their communications with Defendant, representatives from PCRM and PETA expressed concern over the amount of animal testing that would occur as a result of the HPV Challenge Program. (Complaint ¶ 9.) Plaintiffs lobbied for limits on the amount of animal testing that would occur, requesting that EPA: 1) reduce the number of chemicals included in the program on the grounds that already-existing SIDS data were sufficient or fur-

ther testing was otherwise unnecessary, 2) change the program so that data would be generated by means other than animal testing, and 3) rely solely on human exposure and use data. (*Id.* ¶ 8.)

Defendant contends that it made changes to the HPV Challenge Program to address Plaintiffs' concerns and minimize the amount of animal testing performed under the program. On October 14, 1999, EPA sent a letter to companies participating in the program delineating a series of principles that were designed to minimize the amount of animal testing used in the program. Companies were urged to test chemicals in groups where appropriate to reduce the overall number of tests required, to defer all testing other than group testing until November 2001, to maximize use of existing data, and to exercise good judgment regarding when certain types of tests were unnecessary. (DR56.1 ¶¶ 21–22.) Plaintiffs dispute whether the HPV Challenge Program was changed at all to minimize the amount of animal testing performed and, although Plaintiffs concede that the above-referenced letter was sent and that the principles described above were included, they dispute whether the principles were consistently adhered to by either EPA or the companies participating in the program. (Pl's Response to DR56.1 ¶¶ 21–22.)

Plaintiffs contend that EPA, CMA and EDF underestimated the amount of data on HPV chemicals that was publicly available prior to the establishment of the HPV Challenge Program. Plaintiff PCRM released a report on August 1, 2001, finding that toxicity data that were already present in publicly available databases overlooked by EDF and EPA were sufficient to make basic assessments of the risks associated with most HPV chemicals. (PR56.1 ¶ 26.) Plaintiffs also point to an April 1998 EPA report admitting

that its search for all publicly available data was not comprehensive due to limited resources, as well as a June 17, 1999 statement by the EDF before the House Committee on Science, Subcommittee on Energy and Environment, acknowledging that it was likely that some additional unconsidered relevant information for assessing toxicity was available. (*Id.* ¶¶ 28–29.) Defendant asserts that the reason that sponsors participating in the HPV Challenge Program are asked to conduct a review of all relevant existing data before performing testing is to address this concern, *i.e.*, that some available data have not yet been uncovered. (Def's Response to PR56.1 ¶ 27.)

Despite the involvement of EDF and CMA in the development of the HPV Challenge Program, EPA did not create any "advisory committee" under FACA in connection with the initiative. EPA also did not file a charter or make findings either that meetings with groups such as EDF and CMA were in the public interest or that the composition of attendees at the meetings was fairly balanced and did not include members with inappropriate special interests. EPA neither made its meetings with EDF and CMA open to the public nor published notices in the Federal Register about meetings relating to the HPV Program. EPA also did not make available for public inspection any records, documents, or transcripts from HPV Challenge Program-related meetings with EDF and CMA until after the commencement of this lawsuit. (PR56.1 ¶¶ 10–14; Def's Response to PR56.1 ¶¶ 10–14.)

On July 16, 2002, Plaintiff PCRM requested that EPA provide it with copies of "any and all documents generated as a result of the meeting(s) between the EPA, the Environmental Defense Fund (now Environmental Defense), and the Chemical Manufacturers Association (now the American Chemistry Council) from April to Oc-

tober 1998 which resulted in the development of the HPV Challenge Program." (Letter Request For Discovery from PCRM to EPA, July 16, 2002; PR56.1 ¶ 34.) No documents concerning the development of the HPV Challenge Program were produced to Plaintiff or otherwise made publicly available by EPA until February 13, 2003, when Defendant responded to the July 16, 2002 request by sending a letter and providing documents. (Letter from Defendant Responding to Request for Documents, Feb. 13, 2003.)

## DISCUSSION

### Summary Judgment Standard

Summary judgment shall be granted in favor of the moving party where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The initial burden is on the moving party to establish the absence of any genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The burden then shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." *Natural Resources Defense Council v. Evans*, 254 F.Supp.2d 434, 438 (S.D.N.Y.2003) (quoting *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505). In the context of a motion for summary judgment, a fact is material "if it might affect the outcome of the suit under the governing law." *Holtz v. Rockefeller & Co.* 258 F.3d 62, 69 (2d Cir.2001) (quoting *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505). A fact is genuinely at issue if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Rule 56(c) mandates that summary judgment be entered, "after adequate time for discovery and upon motion,

against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 884, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). When cross-motions for summary judgment are filed, "the standard is the same as that for individual motions for summary judgment." *Natural Resources Defense Council*, 254 F.Supp.2d at 438. "The court must consider each motion independently of the other and, when evaluating each, the court must consider the facts in the light most favorable to the non-moving party." *Id.* (citing *Morales v. Quintel Entertainment, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001)).

### Toxic Substances Control Act

According to its legislative history, TSCA was enacted by Congress in an effort to remedy the "unreasonable risks of injury to health or the environment associated with the manufacture, processing, distribution in commerce, use, or disposal of chemical substances." S.Rep. No. 94–698, at 1 (1976), reprinted in 1976 U.S.C.C.A.N. 4491. In light of the "ever-accelerating growth of the chemical industry" over the last century and the resultant torrent of commercially-used chemicals being released into the environment, the Senate Committee Report states, Congress intended TSCA to be "a comprehensive measure to protect the public and the environment from exposure to hazardous chemicals." *Id.* at 3.

The legislation would assure that chemicals receive careful premarket scrutiny before they are manufactured or distributed to the public. This provision would end the present situation where chemicals can be marketed without notification of any government body and with-

out any requirement that they be tested for safety. Thus, this provision would no longer allow the public or the environment to be used as a testing ground for the safety of these products.

*Id.* TSCA mandates that EPA issue a rule requiring that testing be performed to develop data on the health and environmental effects of a particular substance or mixture once EPA makes certain findings confirming the need to conduct testing on that substance or mixture. Section 4 of TSCA provides that EPA "shall by rule" require testing if it finds that:

(A)(i) the manufacture, distribution in commerce, processing, use, or disposal of a chemical substance or mixture, or that any combination of such activities, may present an unreasonable risk of injury to health or the environment,

(ii) there are insufficient data and experience upon which the effects of such manufacture, distribution in commerce, processing, use, or disposal of such substance or mixture or of any combination of such activities on health or the environment can reasonably be determined or predicted, and

(iii) testing of such substance or mixture with respect to such effects is necessary to develop such data; or

(B)(i) a chemical substance or mixture is or will be produced in substantial quantities, and (I) it enters or may reasonably be anticipated to enter the environment in substantial quantities or (II) there is or may be significant or substantial human exposure to such substance or mixture,

(ii) there are insufficient data and experience upon which the effects of the manufacture, distribution in commerce, processing, use, or disposal of such substance or mixture or of any combination of such activities on health or the environment can reasonably be determined or predicted, and

(iii) testing of such substance or mixture with respect to such effects is necessary to develop such data.

15 U.S.C.A. § 2603(a)(1) (West 1998). Any required rules must be developed in accordance with the notice and comment provisions of the Administrative Procedure Act ("APA"), 5 U.S.C.A. § 553, which requires agencies to publish notice of proposed rules in the Federal Register and solicit comments from interested parties prior to the formulation of final rules. Another TSCA provision requires EPA to give interested persons the chance to present their views orally, rather than solely through written submissions, in connection with such rulemaking proceedings. *See* 15 U.S.C.A. § 2603(b)(5). TSCA further requires that any final test rule identify the chemical substance or mixture for which testing will be performed, include standards for the development of test data on that substance or mixture, and provide deadlines for the completion of testing and the submission of test results. 15 U.S.C.A. § 2603(b)(1). Finally, TSCA provides that any person may file a petition for judicial review of a rule relating to testing not later than sixty days after promulgation of the rule pursuant to section 2603(a) of the statute. 15 U.S.C.A. § 2618 (West 1998).

Since the enactment of TSCA in 1976, EPA has issued approximately thirty-one test rules under the statute, "covering approximately 114 chemical substances and mixtures." (Auer Decl. ¶ 8.)

*Plaintiffs' Claims that the HPV Challenge Program Violates TSCA*

*Plaintiffs Contend that EPA Has Made De Facto Findings Under 15 U.S.C. § 2603(a)(1)(B) that Require it to Promulgate a Formal Test Rule Rather than Participate in a Voluntary Testing Program*

To trigger EPA's mandatory duty under TSCA to initiate formal rulemaking, EPA

must make findings, either expressly or *de facto*,[1] under TSCA section 2603(a)(1)(A) or (a)(1)(B). Plaintiffs assert only that EPA has made *de facto* findings under (a)(1)(B). The requisite "B-track" findings include a determination that a chemical substance or mixture is or is expected to be produced in "substantial quantities," and that the substance or mixture either enters or may reasonably be expected to enter the environment in substantial quantities *or* "there is or may be significant or substantial human exposure to such substance or mixture." 15 U.S.C.A. § 2603(a)(1)(B)(i). In addition, it must be determined that insufficient data exist to reasonably assess the effects of commercial use of the substance or mixture on health and the environment, and that testing of the substance or mixture is necessary to develop the data to make such an assessment. 15 U.S.C.A. § 2603(a)(1)(B)(ii) and (iii).

Defendant's principal contention with respect to Plaintiffs' TSCA claim is that Plaintiffs' evidence is insufficient to establish that EPA has made *de facto* findings with respect to all of the approximately 2,800 chemical substances and mixtures that are the subject of the HPV Challenge Program. Defendant contends that the mandatory provisions of Section 4 therefore are not implicated and, accordingly, that EPA has no non-discretionary duty to engage in formal rulemaking. As a result, Defendant argues, the Court lacks subject matter jurisdiction over Plaintiffs' claim pursuant to TSCA's citizen suit provision, which only permits a person to file an action "against the Administrator [of EPA] to compel the Administrator to perform

any act or duty under [TSCA] which is not discretionary." 15 U.S.C.A. § 2619(a)(2).

The Court agrees with Defendant that EPA has not made all of the requisite Section 4 findings with respect to *all* of the approximately 2,800 chemical substances and mixtures involved in the HPV Challenge Program. The Court now examines the undisputed evidence relating to each of the relevant Section 4 issues in turn.

While TSCA does not define key terms and phrases such as, for example, what it means for a chemical to be "produced in substantial quantities" or what level of human exposure would be considered "substantial," EPA has established guidelines for determining whether the B-track requirements have been satisfied with respect to a particular chemical. *See* EPA, TSCA Section 4(a)(1)(B) Final Statement of Policy; Criteria for Evaluating Substantial Production, Substantial Release, and Substantial or Significant Human Exposure, 58 Fed.Reg. 28,736 (May 14, 1993). Although not intended by the EPA to be an "automatic trigger for testing," the EPA's policy statement is useful in determining whether EPA has made *de facto* findings for a particular chemical or group of chemicals. According to the policy statement, EPA has "established a threshold value of 1 million pounds, aggregate production volume of the chemical substance per year for all manufacturers, as the substantial production threshold." *Id.* at 28,746. The HPV chemicals that are part of the HPV Challenge Program are by definition produced in quantities equal to or greater than 1 million pounds per year.

---

1. Even though EPA has not made formal findings that the threshold requirements have been met, a court may conclude from the "substance of the agency action" that findings were made on a *de facto* basis. *Natural Resources Defense Council, Inc. v. EPA,* 595 F.Supp. 1255, 1261 (S.D.N.Y.1984) ("*NRDC* "). Once such a determination is made, a court must require EPA to initiate formal rulemaking in accordance with 15 U.S.C.A. § 2603(a). *Id.*

The analysis, however, becomes more complex with respect to the other B–Track findings required to trigger EPA's mandatory duty to engage in formal rulemaking. EPA has also issued guidelines with respect to whether there has been substantial release into the environment, and as to whether there has been substantial or significant human exposure. For environmental release to be considered "substantial," EPA has established "a threshold value of 1 million pounds of release to the environment from all sources per year; or release equal to or greater than 10 percent of production volume per year, whichever is lower." *Id.* EPA has established a three-part criterion for finding substantial or significant human exposure. For the general population, substantial exposure is at least 100,000 people and significant exposure is 100,000 people exposed more directly or on a routine or episodic basis. For consumers, substantial exposure is at least 10,000 people, while significant exposure entails 10,000 exposures that are more direct or are on a routine or episodic basis. Finally, for workers, substantial exposure is at least 1,000 people, while significant exposure is 1,000 or more exposed more directly or on a routine or episodic basis. *Id.*

It is undisputed that EPA has made no formal findings regarding whether any of the HPV Challenge Program chemicals actually meet these guideline levels for substantial release and substantial or significant exposure. Plaintiffs instead cite general statements by EPA regarding the Chemical Right–to–Know initiative and HPV Challenge Program to make their case that the requisite findings have been made on a *de facto* basis. For instance, Plaintiffs point out that, "in justifying the creation of [the Chemical Right–to–Know initiative], EPA announced that it would 'empower citizens with knowledge about the most widespread chemicals in com-merce—chemicals that people may be exposed to in the places where they live, work, study, and play,' as well as in their 'environment' and 'in the products they buy.'" Pl's Mem. In Support of Pl's Motion for Summ. J. at 18 (quoting EPA, Data Collection and Development on High Production Volume (HPV) Chemicals, 65 Fed.Reg. 81,686, 81,687 (Dec. 26, 2000)). Plaintiffs also note that EPA said that "the reason for testing HPV Chemicals was because these chemicals are 'used in the greatest quantities in the United States today,' and thus, 'the citizens of this country deserve to have basic health and environmental information about the chemicals they come in contact with on a daily basis.'" *Id.* (quoting Letter from EPA to Manufacturers/Importers, Oct. 9, 1998). Finally, Plaintiffs assert that EPA "devised the HPV challenge because 'it is generally accepted that chemicals having a high level of production have an increased potential for exposure in comparison to low production volume chemicals.'" *Id.* (quoting 65 Fed.Reg. 81,688). The legal significance, if any, of these general statements is hotly disputed and, in light of the Court's conclusion, *infra*, that further development of the factual record on other TSCA issues is necessary, the Court will not seek to resolve this legal issue at this time.

Plaintiffs also rely on general statements by EPA with respect to their assertions that EPA has made *de facto* findings that "there are insufficient data and experience upon which" a chemical's effects "can be reasonably determined or predicted," and that testing is necessary to develop data on the chemicals in question. 15 U.S.C.A. § 2603(a)(1)(B)(ii) and (iii). Plaintiffs contend that "[t]he record is replete" with evidence that insufficient data exists, noting that the "whole premise of the HPV challenge is to close the 'data

gap' on HPV chemicals." *Id.* at 19 (quoting 65 Fed.Reg. 81,686). Plaintiffs note that EPA stated in its October 9, 1998 letter to manufacturers and importers that "[t]he HPV Challenge Program encourages chemical manufacturers to voluntarily test those chemicals for which little or no health or environmental effects data are publicly available." *Id.* Plaintiffs point to a number of other EPA statements, including the EPA's remarks that "there is little or no publicly available information regarding the potential hazards associated with most HPV chemicals," *Id.* at 20 (quoting 65 Fed.Reg. 81,686), and that "insufficient data are available to characterize many of the HPV chemicals," *Id.* (quoting 85 Fed.Reg. 81,688), to bolster their argument that EPA has made a *de facto* finding of insufficient data.

As to the necessariness prong, Plaintiffs refer to the Joint Announcement of the HPV Challenge Program, where EPA stated that "[a]dditional chemical testing is necessary" and that "carrying out the necessary tests ... will allow efforts to protect public health and the environment to focus on those chemicals that truly show a likelihood of posing potential harm ... The more that is known about which chemicals do—and do not—need close attention, the less anxiety there should be about unknown or undiscovered risks from chemical use in general." *Id.* at 21. This statement indicates that EPA generally believes additional testing to be necessary and useful, but it does not establish that EPA has found such testing necessary for all of the 2,800 or so HPV Challenge Program chemicals as a group, or for any specific chemicals within that group. In fact, the very nature of the HPV Challenge Program suggests otherwise, given that sponsors are asked to perform an extensive review and prepare a "robust summary" of existing data on a particular chemical in an effort to discern whether testing on that chemical is really necessary before any testing is performed.

According to a December 26, 2002, notice published by EPA in the Federal Register describing the HPV Challenge Program, the program "is designed to assemble basic screening level test data on the potential hazards of HPV Chemicals while avoiding unnecessary or duplicative testing." EPA, Data Collection and Development on High Production Volume (HPV) Chemicals, 65 Fed.Reg. 81,686 (Dec. 26, 2000). EPA stated in that notice that "testing will be necessary only when data do not exist or when existing data are not adequate." *Id.* at 81692. In order to avoid such unnecessary or duplicative testing, sponsors are asked to provide "robust summaries and full copies of all study reports from new studies and existing data" to EPA in a timely manner prior to the onset of any testing. *Id.* at 81,694. Further, the notice states, that "[i]n analyzing the adequacy of existing data, EPA encouraged participants to conduct a thoughtful and qualitative analysis rather than using a rote checklist approach. If EPA judges the available data to be adequate, the data gap identified in the HPV initiative will be considered filled." *Id.* at 81,690. "After relevant existing data have been identified and EPA has judged their adequacy, participants will analyze the status of existing data fulfilling the SIDS data set and prepare a test plan which identifies needed testing based on this analysis." *Id.* at 81,692. Test plans prepared and submitted by program participants are to be posted for 120 days prior to the initiation of any testing; during that time period "EPA will also review the test plans ... and will judge the adequacy of any existing data submitted with the test plan." *Id.* "[I]f at any time the Agency receives adequate existing data that fulfill a specific data gap, EPA will en-*

sure that *unnecessary testing is not conducted.*" *Id.* at 81,690. (emphasis supplied).

In view of EPA's own description of the HPV Challenge Program's operation, when the evidence is construed in the light most favorable to Plaintiffs, the possibility is left open that EPA's decision, after review of the robust summary as to any given chemical, not to object to implementation of the sponsor's testing proposal constitutes a *de facto* determination that insufficient data exist and testing is necessary. Such a *de facto* determination, should it ultimately be decided that EPA has also made *de facto* determinations of substantial release and substantial exposure, would trigger formal rulemaking obligations under TSCA Section 4. The Court cannot, however, make a determination on this issue absent a more developed factual record as to EPA's conduct in connection with the review of robust summaries, the interposition of objections to testing proposals and/or the implementation of sponsors' testing proposals.

■ Thus, while the Court cannot grant summary judgment in Plaintiffs' favor because there is insufficient evidence in the record at this point to indicate that the requisite Section 4 findings have been made as to any or all of the HPV Challenge Program chemicals, neither can the Court grant summary judgment in favor of Defendant because the evidence, when viewed in the light most favorable to Plaintiffs, suggests that further development of the record might show that, in situations where EPA does not object to testing and HPV Challenge Program testing is allowed to go forward, EPA has implicitly made all of the requisite Section 4 findings. Therefore, both motions for summary judgment are denied without prejudice as to Plaintiffs' TSCA compliance claim.

*Plaintiffs Contend that the HPV Challenge Program is Ultra Vires*

Plaintiffs argue that EPA exceeded its authority under TSCA by employing a voluntary testing program rather than pursuing testing via formal rulemaking in accordance with Section 4 of TSCA. Plaintiffs contend that TSCA should be read to indicate that the only avenue available for EPA to participate in any testing program is by making the requisite Track A or Track B findings and then promulgating a test rule via notice-and-comment rulemaking in accordance with TSCA. Thus, Plaintiffs argue, EPA's participation in a voluntary program such as the HPV Challenge Program is *ultra vires*, and further implementation of the program should be enjoined.

■ The Court finds that Plaintiffs' *ultra vires* claim must be dismissed for lack of subject matter jurisdiction. Plaintiffs invoke only TSCA's citizen suit provision, 15 U.S.C.A. § 2619(a)(2), as a basis for the Court's jurisdiction over their *ultra vires* claim. Under this provision, "any person may commence a civil action ... against the Administrator to compel the Administrator to perform any act or duty under this chapter which is not discretionary." *Id.* TSCA's citizen suit provision constitutes a limited waiver of the federal government's sovereign immunity applying only in situations where there is a colorable claim that EPA has failed to perform an act or duty that is non-discretionary. In making their *ultra vires* argument, Plaintiffs fail to explain how their assertion that EPA acted outside the scope of its authority under TSCA amounts to a failure by EPA to perform a non-discretionary duty. Hence, Plaintiffs' *ultra vires* claim falls outside the bounds of the limited waiver of sovereign immunity embodied in TSCA's citizen suit provision. Defendant's motion for summary judgment is, there-

fore, granted with respect to Plaintiffs' *ultra vires* claim, while Plaintiffs' cross-motion for summary judgment as to the *ultra vires* claim is denied.

*Plaintiffs' Request For Limited Additional Discovery Pursuant to F.R.C.P. 56(f)*

█ Plaintiffs have submitted an affidavit seeking an order permitting limited discovery relating to Plaintiffs' FACA claim pursuant to Federal Rule of Civil Procedure 56(f). Rule 56(f) provides that:

> Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

Fed.R.Civ.P. 56(f). "Courts have interpreted Rule 56(f) to provide that when a party facing an adversary's motion for summary judgment reasonably advises the court that it needs discovery to be able to present facts needed to defend the motion, the court should defer decision of the motion until the party has had the opportunity to take discovery and rebut the motion." *G–I Holdings, Inc. v. Baron & Budd,* No. 01 Civ. 0216, 2002 WL 31251702, at * 4 (S.D.N.Y. Oct.8, 2002) (citations omitted). "Rule 56(f) is a safeguard against premature grants of summary judgment and 'should be applied with a spirit of liberality.'" *Dubai Islamic Bank v. Citibank, N.A.,* 126 F.Supp.2d 659, 665 (S.D.N.Y. 2000) (citing *Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.,* 945 F.Supp. 693, 706 (S.D.N.Y.1996)). However, Rule 56(f) "is not a shield against all summary judgment motions. Litigants seeking relief under the rule must show that the material sought is germane to the defense, and that

it is neither cumulative nor speculative." *Paddington Partners v. Bouchard,* 34 F.3d 1132, 1138 (2d Cir.1994) (citation omitted). The district court has discretion in deciding whether to allow such additional discovery. *G–I Holdings, Inc.,* 2002 WL 31251702, at *4.

According to Plaintiffs' Rule 56(f) affidavit, in a letter dated July 16, 2002, Plaintiffs requested that EPA produce "'any and all documents generated as a result of the meeting(s) between the EPA, [EDF], and [CMA] from April to October 1998 which resulted in the development of the HPV Challenge Program.'" Plaintiffs acknowledge that Defendant responded to Plaintiffs' request in a timely fashion, producing a set of documents to Plaintiff on February 13, 2003, but assert that Defendant raised issues in its papers pertaining to the instant motions that were not addressed either in the documents produced on February 13, 2003, or in any of the information relating to the development of the HPV Challenge Program that is publicly available. Plaintiffs seek additional limited discovery with respect to these issues before Defendant's motion for summary judgment on the FACA claim is decided.

The Court finds that, for the most part, the issues referred to in Plaintiffs' affidavit and the accompanying requests for additional discovery that Plaintiffs articulate based on those issues fall outside the scope of Plaintiffs' July 16, 2002 discovery request. Plaintiffs' July 16, 2002 request called specifically for documents "generated as a result of the meeting(s)" between EPA, EDF and CMA that led to the development of the program. With the possible exception of Plaintiffs' request for updates EPA received in connection with a meeting involving CMA, EDF and EPA held sometime between October 1997 and April 1998, the requests for additional discovery artic-

ulated in Plaintiffs' Rule 56(f) affidavit call for the production of information that was not generated as a result of the meeting or meetings described in the July 16, 2002 request. The discovery requests detailed in Plaintiffs' Rule 56(f) affidavit, therefore, must be viewed as new requests being articulated for the first time at this late stage of the litigation process, when summary judgment motions have already been filed.

According to the Second Circuit, a district court may properly deny further discovery if the party opposing a motion for summary judgment "has had a fully adequate opportunity for discovery." *Trebor Sportswear Co., Inc. v. The Limited Stores, Inc.*, 865 F.2d 506, 511–12 (2d Cir. 1989); *see also Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 927 (2d Cir.1985) (denying plaintiff's request for additional discovery when "it had ample time in which to pursue the discovery that it now claims is essential"). "A party who both fails to use the time available and takes no steps to seek more time until after a summary judgment motion has been filed need not be allowed more time for discovery absent a strong showing of need." *Burlington Coat Factory*, 769 F.2d at 928.

■ Here, Plaintiffs had ample opportunity to pursue the discovery requests currently at issue well in advance of the dates on which summary judgment motions were filed. In the parties' Joint Preliminary Pre–Trial Statement dated December 16, 2002, the parties expressed their view that "no discovery is necessary for resolution of the issues raised in this case." Parties' JPPTS at 17. Notwithstanding that representation, the Court made provision for a two-month discovery period, urging the parties to ensure that any discovery they deemed necessary in conjunction with the anticipated motions be addressed prior to the commencement of motion practice. Although Plaintiffs contend that the requests included in their Rule 56(f) affidavit were based on information that was provided to them for the first time in Defendant's motion papers and, therefore, could not have been articulated prior to the filing of the summary judgment motions, the Court finds the FACA issue to have been sufficiently clear from the outset that Plaintiffs could have made an assessment of whether the types of information now requested were important to its case and, if so, could have served requests during the discovery period. Plaintiffs thus have failed to make the "strong showing of need" required to overcome their failure to make adequate use of the time that was available.

Additionally, Plaintiffs have not carried their burden of demonstrating that the discovery sought can reasonably be expected to create a genuine issue of material fact. The Second Circuit has articulated a four-part test for determining whether a Rule 56(f) affidavit or declaration is sufficient to warrant the reopening of discovery. "The affidavit or declaration must detail: (1) the nature of the uncompleted discovery; (2) how the facts sought are reasonably expected to create a genuine issue of material fact; (3) what efforts the affiant has made to obtain those facts; and (4) why those efforts were unsuccessful." *G–I Holdings, Inc.*, 2002 WL 31251702, at *4 (citing *Paddington Partners*, 34 F.3d at 1138). Plaintiffs' Rule 56(f) affidavit is devoid of any explanation of how information responsive to the discovery requests included within it is expected to create a material issue of fact. Plaintiffs have offered no evidence to support a conclusion that the information requested could potentially demonstrate a level of management or control on the part of EPA that would be sufficient to enable Plaintiffs to

prevail on their FACA claim. Hence, Plaintiffs' request for additional limited discovery before the Court renders a decision on the cross-motions for summary judgment pertaining to Plaintiffs' FACA claim is denied. The Court now turns to the merits of that claim.

*Plaintiffs' Claim that EPA Violated the Federal Advisory Committee Act*

FACA was passed by Congress in 1972 as a vehicle "to assess the need for the 'numerous committees, boards, commissions, councils, and similar groups which have been established to advise officers and agencies in the executive branch of the Federal Government.'" *Public Citizen v. United States Dep't of Justice*, 491 U.S. 440, 445–46, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989) (quoting 5 U.S.C.A.App. 2 § 2(a)).

> [FACA's] purpose was to ensure that new advisory committees be established only when essential and that their number be minimized; that they be terminated when they have outlived their usefulness; that their creation, operation, and duration be subject to uniform standards and procedures; that Congress and the public remain apprised of their existence, activities, and cost; and that their work be exclusively advisory in nature.

*Public Citizen*, 491 U.S. at 446, 109 S.Ct. 2558 (citing 5 U.S.C.A.App. 2 § 2(b)).

Plaintiffs contend that Defendant violated Sections 3, 5, 9 and 10 of FACA by meeting with representatives of CMA and EDF during the development of the HPV Challenge Program without complying with the disclosure, committee composition and procedural provisions of FACA. Section 3 of FACA defines "advisory committee" as follows:

> (2) The term "advisory committee" means any committee, board, commission, council, conference, panel, task force, or other similar group, or any subcommittee or other subgroup thereof (hereafter in this paragraph referred to as "committee"), which is-
>
> (A) established by statute or reorganization plan, or
>
> (B) established or utilized by the President, or
>
> (C) established or utilized by one or more agencies,
>
> in the interest of obtaining advice or recommendations for the President or one or more agencies or officers of the Federal Government, except that such term excludes (i) the Advisory Commission on Intergovernmental Relations, (ii) the Commission on Government Procurement, and (iii) any committee which is composed wholly of full-time officers or employees of the Federal Government.

5 U.S.C.A.App. 2 § 3(2) (West 1996). FACA's provisions impose a number of requirements, including a mandate that advisory committees created by legislation or by the President or other federal officials be "fairly balanced in terms of points of view represented," and that any legislation establishing or authorizing the establishment of an advisory committee contain provisions preventing the committee's advice and recommendations from being "inappropriately influenced by the appointing authority or by a special interest." 5 U.S.C.A.App. 2 § 5(b)(2) and (3) (West 1996). In addition, FACA provides that an advisory committee shall not be established absent a formal determination by the agency that the committee is in the public interest. 5 U.S.C.A.App. 2 § 9(a)(2) (West 1996).

Once an advisory committee has been established within the meaning of FACA, the statute imposes a number of procedural requirements. For instance, FACA

mandates that an advisory committee charter be filed prior to any committee meetings or actions taken by the committee. 5 U.S.C.A. § 9(c). FACA also requires that each committee meeting be made open to the public (provided the meetings do not fall within an exemption under the Freedom of Information Act, 5 U.S.C.A. § 552), that timely notice of upcoming meetings be published in the Federal Register (except when the President determines otherwise for reasons of national security), that all "records, reports, transcripts ... or other documents which were made available to or prepared for or by each advisory committee" be made available for public review, and that detailed minutes be kept of all committee meetings. 5 U.S.C.A.App. 2 § 10(b) and (c); *Public Citizen*, 491 U.S. at 446–447, 109 S.Ct. 2558.

█ For the purpose of the instant motions, the issue to be decided is whether the EPA "established" and/or "utilized" a committee within the meaning of Section 3 of FACA, 5 U.S.C.A.App. 2 § 3(2)(C). The Court finds, based on the undisputed factual record, and drawing all reasonable inferences in Plaintiffs' favor, that EPA's involvement with CMA and EDF in connection with the development of the HPV Challenge Program did not constitute the establishment or utilization of an advisory committee under FACA.

The Supreme Court has "squarely rejected an expansive interpretation of the words, reading 'established' and 'utilized' narrowly to prevent FACA from sweeping more broadly than the Congress intended." *Byrd v. EPA*, 174 F.3d 239, 245 (D.C.Cir.1999) (citing *Public Citizen*, 491 U.S. at 452, 461, 109 S.Ct. 2558). Although, in *Public Citizen*, the Court focused primarily on the meaning of "utilized" and did not have to decide whether the ABA committee at issue had been "es-

tablished" by the President within the meaning of FACA (all parties agreed it was not so "established"), courts have, nonetheless, interpreted the Supreme Court's decision as holding that an advisory committee is established by an agency "only if it is actually formed by the agency." *Byrd*, 174 F.3d at 245 (citing *Public Citizen*, 491 U.S. at 452, 456–457, 109 S.Ct. 2558); *see also Natural Resources Defense Council v. Abraham*, 223 F.Supp.2d 162, 185 (D.D.C.2002); *Aluminum Co. of Am. v. Nat'l Marine Fisheries Serv.*, 92 F.3d 902, 905 (9th Cir.1996). Similarly, in *People For the Ethical Treatment of Animals v. Barshefsky*, 925 F.Supp. 844, 848 (D.D.C.1996), the D.C. Circuit observed that "a liberal interpretation of the word 'establish' was expressly rejected by the Conference Committee responsible for the ultimate bill that became law" and concluded that "for a committee to be established by an agency, it must be 'directly established' by the agency." Plaintiffs have offered no evidence to indicate that EPA was responsible for initiating the meetings between and among representatives of CMA, EDF and EPA. Defendant alleges, and Plaintiffs say they do not have knowledge or information sufficient to dispute, that EDF began discussions with CMA (with EPA being kept informed of developments and even attending meetings in some cases) during the summer of 1997 in connection with EDF's challenge to chemical companies to make health data on chemicals available, well in advance of Vice President Gore's April 1998 announcement of the Chemical Right–to–Know initiative. Although more meetings between and among CMA, EDF and EPA occurred after the announcement, there is no evidence that EPA was the driving force behind those meetings or that it exerted any control over who attended and what was discussed. Hence, an advisory committee within the meaning of FACA was not "es-

tablished" by EPA in connection with the development of the HPV Challenge Program.

Describing "utilize" as a "woolly verb, its contours left undefined by the statute itself," the Supreme Court declined to adopt the dictionary definition of the term in interpreting its meaning for the purposes of FACA. *Public Citizen,* 491 U.S. at 452, 109 S.Ct. 2558. The Court found that adopting the term's literal meaning "would extend FACA's requirements to any group of two or more persons", or at least any formal organization, from which the President or an Executive agency seeks advice" and that this would be a result "Congress did not intend." *Id.* at 452, 109 S.Ct. 2558. Interpreting *Public Citizen,* the court in *Byrd* determined that an advisory committee is " 'utilized' by an agency only if it is amenable to ... strict management by agency officials." 174 F.3d at 245 (quoting *Public Citizen,* 491 U.S. at 457–58, 109 S.Ct. 2558). Also interpreting *Public Citizen,* the court in *Food Chemical News v. Young,* 900 F.2d 328, 332–33 (D.C.Cir. 1990), held that " 'established' indicates a 'Government-formed advisory committee,' while 'utilized' encompasses a group organized by a nongovernmental entity but nonetheless so 'closely tied' to an agency as to be amenable to 'strict management by agency officials.' " (citation omitted). According to the D.C. Circuit, " 'the utilized test is a stringent standard, denoting 'something along the lines of *actual management or control* of the advisory committee.' " *Animal Legal Defense Fund v. Shalala,* 104 F.3d 424, 430 (D.C.Cir.1997) (quoting *Washington Legal Found. v. United States Sentencing Comm'n,* 17 F.3d 1446, 1450 (D.C.Cir.1994) (emphasis supplied)). Here, Plaintiffs have not offered evidence to indicate that EPA managed or exerted control over any aspect of the discussions between CMA and EDF. The parties began meeting of their own

accord and, although EPA was informed about the progress of their discussions and even attended certain meetings, Plaintiffs have not established that EPA ever managed or controlled the timing, agenda, etc., of the discussions. Defendant concedes that EPA did inform CMA and EDF that it would consider a joint proposal in response to the Vice President's challenge, but Plaintiffs do not offer evidence to indicate that EPA dictated the terms, scope or any other aspect of the potential proposal. Hence, EPA's involvement with CMA and EDF did not, as a matter of law, amount to the utilization of an advisory committee within the meaning of FACA.

Plaintiffs rely primarily on two cases to support their contention that EPA established and utilized an advisory committee within the meaning of FACA. Both are distinguishable from the case at bar. First, Plaintiffs cite the lone Second Circuit case dealing with the issue, *National Nutritional Foods Ass'n v. Califano,* 603 F.2d 327 (2d Cir.1979), wherein the Court of Appeals found that a single meeting between five clinicians and seven Food and Drug Administration ("FDA") officials to decide the best course of action for regulating protein products used for weight reduction and informing the public of the products' risk potential constituted an "advisory committee" within the meaning of FACA. *Califano* differs from the instant case in that the person within FDA who was chiefly responsible for the type of products at issue in the case contacted the clinicians, who were participating in a conference on obesity near FDA's headquarters, and arranged to have them meet on a specific date. FDA also prepared a memorandum expressly detailing the purpose of the meeting. *Id.* at 329–30. Hence, FDA exerted far more control over the creation and functioning of that committee than EPA did in the case at bar. Plain-

tiffs also cite *Northwest Forest Resource Council v. Espy*, 846 F.Supp. 1009 (D.D.C. 1994) as being "directly applicable" to the instant case. (Pl. Opp. to EPA's Motion for Summ. J. and Reply to EPA's Opp. to Motion for Summ. J. at 18). In *Espy*, the D.C. Circuit determined that an entity called the Forest Ecosystem Management Assessment Team ("FEMAT") was an advisory committee within the meaning of FACA. *Espy* is distinguishable from the instant case in that, there, the Director of the White House Office of Environmental Policy had established an inter-agency group, or executive committee, with the Director herself acting as chairperson, to "direct and supervise the work of FEMAT." *Id.* at 1011. This executive committee gave instructions to FEMAT on what goals to pursue and how to pursue them (namely, dictating that the committee identify alternatives for the management of federal forest lands, employing an ecosystem approach, to maximize the forests' contribution). Once again, the executive committee exerted significantly greater control over the establishment and functioning of FEMAT than EPA did over the meetings involving CMA and EDF.

The undisputed factual record before this Court cannot reasonably be construed to indicate that an advisory committee was established or utilized under FACA. Viewing the facts in the light most favorable to Plaintiff, a rational factfinder could not conclude that EPA exerted the level of management or control over the dealings of CMA and EDF that is required for those dealings to fall under the rubric of "advisory committee" within the meaning of FACA. As a result, EPA was under no obligation to conform with FACA's provisions governing the creation and functioning of advisory committees in its dealings with EDF and CMA in connection with the development of the HPV Challenge Program. Defendant's motion for summary judgment is, therefore, granted with respect to Plaintiffs' FACA claim, and Plaintiffs' motion for summary judgment is denied as to that claim.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is granted with regard to Plaintiffs' *ultra vires* and FACA claims, and Plaintiffs' cross-motion for summary judgment is denied as to those claims. Both motions are denied without prejudice with respect to Plaintiffs' claim that *de facto* findings have been made under Section 4 of TSCA. Plaintiffs' request for further discovery pursuant to Fed.R.Civ.P. 56(f) is denied.

SO ORDERED.