**MICCOSUKEE TRIBE OF INDIANS OF FLORIDA, a federally-recognized Indian tribe, Plaintiff,**

v.

**UNITED STATES of America, U.S. Army Corps of Engineers, et al., Defendants.**

No. 02–22778–CIV–MOORE.

United States District Court, S.D. Florida.

March 14, 2006.

Kelly Sue Brooks, Lehtinen Vargas Reiner & Riedi, Miami, FL, for Plaintiff.

Marcia Berman, United States Department of Justice, Civil Division Ben Franklin Station, Jeremiah Goulka, Joanna B. Goger, United States Department of Justice, Environment and Natural Resources, Mark A. Brown, United States Department of Justice, Wildlife & Marine Resouces Section, Washington, DC, Richard Joseph Grosso, Fort Lauderdale, FL, Bradford H. Sewell, Natural Resources Defense Council Inc., Robert A. Bourque, Simpson Thacher & Bartlett LLP, New York, NY, for Defendants.

**ORDER**

K. MICHAEL MOORE, District Judge.

THIS CAUSE came before the Court upon Plaintiff Miccosukee Tribe's Motion for Summary Judgment on Counts I, II, III, IV, VIII and IX of Plaintiff's Complaint and Incorporated Memorandum of Law (DE # 163), Federal Defendants' Combined Memorandum in Opposition to Plaintiff's Motion for Summary Judgment and in Support of Cross–Motion for Summary Judgment (DE # 167), NRDC Intervenors' Opposition to Miccosukee Tribe of Indians' Motion for Summary Judgment and Intervenors' Cross–Motion for Summary Judgment Against Federal Defendants and Incorporated Memorandum of Law (DE # 172), Federal Defendants' Combined Memorandum in Opposition to NRDC Intervenors' Motion for Summary Judgment and in Support of Cross–Motion for Summary Judgment on Intervenors' Cross–Claims (DE # 188), and all Responses, Replies and Oppositions thereto, as well as Plaintiff Miccosukee Tribe's Motion to Strike Defendants' Exhibit 6 and Arguments Based on it and Incorporated Memorandum of Law (DE # 227).

UPON CONSIDERATION of these Motions, and being otherwise fully advised in the premises, the Court enters the following Order.

*I. Facts*

██ Plaintiff Miccosukee Tribe ("Plaintiff" or the "Tribe") and the Natural Resources Defense Council, Florida Wildlife Federation,[1] Izaak Walton League of America, National Parks Conservation Association, National Wildlife Federation, Sierra Club and the Cape Sable seaside sparrow,[2] *Ammodramus Maritima Mirabilis*[3] (collectively, "In-

---

1. The Florida Wildlife Federation was dismissed from this action on March 7, 2006 (DE # 247).

2. According to the U.S. Fish & Wildlife Service, Cape Sable seaside sparrows are small birds about 13 centimeters or 5 inches long that are primarily found in southern Florida.

3. The Cape Sable seaside sparrow, *Ammodramus Maritima Mirabilis,* does not have standing to serve as a named Intervenor in this action and is hereby dismissed. *See Cetacean Community v. Bush,* 386 F.3d 1169, 1178–9 (9th Cir.2004) ("[i]f Congress and the President intended to take the extraordinary step of authorizing animals as well as people and

tervenors") challenge a series of water management decisions by the U.S. Army Corps of Engineers (the "Corps") designed to avoid jeopardy to the endangered Cape Sable seaside sparrow (the "Sparrow") in the Everglades National Park (the "Everglades") while administering a number of Congressionally authorized programs aimed at balancing the water-related needs of South Florida.

In 1948, Congress authorized the Central and Southern Florida Project for Flood Control and Other Purposes ("C & SF Project"). The purpose of the C & SF Project was to control water flows and levels in South Florida and the Everglades. The C & SF Project provides both flood protection and water supply for the developed areas of South Florida through the use of, among other things, the South Dade Conveyance System ("SDCS")—a series of canals, levees and water control structures. Water Conservation Area 3–A ("WCA–3A") is an Everglades marsh comprising in excess of 100,000 acres in Miami–Dade and Broward counties that is part of the C & SF Project area. The C & SF Project also affects an area in Miami–Dade County known as the 8.5 Square Mile Area, the Miccosukee Reserved Area, and the Tribe's reservations located along Tamiami Trail and Krome Avenue. In order to maintain "acceptable" water levels in WCA–3A, the Water Control Plan and Regulation Schedule guides water managers charged with regulating inflow and outflow of water through the various water control structures within WCA–3A. The Corps and its local sponsor, the South Florida Water Management District ("SFWMD") operate the C & SF Project pursuant to the water regulation schedules.

Following unanticipated environmental consequences, particularly higher water levels in the western part of the Everglades and the drainage of marsh in the eastern half of the Everglades, Congress authorized the Corps and the SFWMD in 1984 to experiment with different methods of delivering water to the Everglades that resulted in better distribution of the water between different areas of the Everglades. Pub.L. No. 101–229, 103 Stat.1946 (Dec. 13, 1989) (codified at 16 U.S.C. § 410r–5 tp 410r–8). This experimentation appeared to have two consequences: First, it led to Congressional authorization of the Modified Water Deliveries Project (the "MWD") which calls for the construction of new water control structures in the northern part of the Everglades; and second, it allowed the Corps to operate different water delivery methods and study their impacts on the Everglades's ecology. Among the water delivery methods employed was "Test 7," which governed water delivery methods in the Everglades from 1995–1999.

Test 7, however, had consistent negative effects on the Sparrow population of the Everglades, leading to the U.S. Fish and Wildlife Service ("FWS") to ask the Corps to reduce water levels in the Sparrow's western nesting habitat in order to increase the probability of successful breeding for that year. The Corps requested and received approval from the Council on Environmental Quality ("CEQ") for emergency alternative arrangements pursuant to the National Environmental Policy Act ("NEPA") and deviated from its Test 7 operations. In February 1999, the FWS issued a final Biological Opinion ("BO") on the effects of Test 7 and other programs on several species, including the Snail

legal entities to sue, they could, and should, have said so plainly") (quoting *Citizens to End Animal Suffering & Exploitation, Inc. v. New*

*England Aquarium,* 836 F.Supp. 45, 49 (D.Mass.1993)).

Kite. The BO concluded, among other things, that the continued operation of Test 7 would lead to the extinction of the Sparrow. In keeping with that conclusion, the FWS provided a "Reasonable and Prudent Alternative" ("RPA") identifying actions that the FWS believed would protect the Sparrow from further danger until the MWD was completed. In December 1999, in response to the BO, the Corps issued the Interim Structural Operating Plan ("ISOP"). Although the ISOP did not include many of the RPA's water management components, the Corps asserted that the ISOP would produce hydrologic conditions equivalent to the RPA. The ISOP directed the closure of certain structures that had the effect of increased water levels in the WCA–3A. The Corps sought and received emergency authorization from CEQ to prepare an Environmental Assessment ("EA") pursuant to NEPA after the initial implementation of ISOP. The consequence of increased water levels was predicted in a draft EA issued in January 2000, followed by a final EA issued in March 2000. CEQ also directed the Corps to prepare a full Environmental Impact Statement ("EIS") for a new, longer term plan, the Interim Operating Plan ("IOP"), that would replace the ISOP and remain in place until completion of the MWD Project. In December 2000, after consultation with CEQ, the Corps issued a revised and updated ISOP ("ISOP 2001").

After a notice and comment period, the Corps issued a Draft Environmental Impact Statement ("DEIS") on the IOP in February 2001. The DEIS assessed six alternatives, including the ISOP 2001, with Alternative 5 as the preferred choice. Public reception led to another round of mediation through the Institute for Environmental Conflict Resolution ("IECR") in order to select a plan for the IOP. After the public comment period on the DEIS ended, the Corps began a series of meetings with various federal and non-federal groups (including the FWS, the Corps, Everglades National Park, and the South Florida Water Management District ("SFWMD")) for the purpose of selecting and recommending a plan for the IOP. To that end, this advisory body selected Alternative 7 as the preferred plan and issued a Supplemental Draft Environmental Impact Statement ("SEIS"). The Corps again took public comments on the SEIS. In December 2001, SFWMD withdrew from the agreement on Alternative 7. In response to this withdrawal, the Corps resumed mediation and developed "Alternative 7R." Alternative 7R contained new operational structures and features that were not included in the SEIS, such as the addition of two large pumps; removal of the southernmost four miles of the L–67 extension levee; and the construction of various seepage reservoirs. In April, 2002, FWS issued an amended Biological Opinion on Alternative 7R that predicted that IOP 7R would degrade 88,300 acres of snail kite critical habitat in WCA–3A. In May 2002, the Corps issued a Final Environmental Impact Statement ("FEIS") recommending Alternative 7R as the Final Recommended Plan. On July 3, 2002, the Corps issued a Record of Decision adopting the Final Recommended Plan.

On September 20, 2002, Plaintiff filed a Complaint alleging violations of the National Environmental Policy Act ("NEPA") and the Endangered Species Act ("ESA"), improper agency action under the Administrative Procedure Act ("APA"), violations of the rulemaking provisions of the APA, violations of the Fifth Amendment guarantee of due process, nuisance under federal common law, violation of the Indian Trust doctrine, as reflected in the Florida Indian Land Claims Settlement Act of 1982, violations of the Federal Advisory Committee Act, and improper delegation of agency authority, all stemming from allegedly improper action by the Corps in adopting and

implementing the IOP. This Court previously dismissed three of Plaintiff's Counts, leaving six counts remaining. *See* DE # 142. In May 2003, the NRDC Intervenors filed an Answer and Cross–Claim for Declaratory Judgment ("Cross–Claim").

## II. Standard of Review

The Plaintiff and Intervenors face an uphill battle. Under the APA, courts must set aside agency decisions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A); *FCC v. National Citizens Committee for Broadcasting*, 436 U.S. 775, 802, 98 S.Ct. 2096, 56 L.Ed.2d 697 (1978). To determine whether agency action is arbitrary or capricious, we must consider "whether the decision was based on a consideration of the relevant factors and whether there has been clear error of judgment." *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989) (citations omitted). The agency must "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). If an agency considers the proper factors and makes a factual determination on whether the environmental impacts are significant or not, that decision implicates substantial agency expertise and is entitled to deference. *Marsh*, at 376, 109 S.Ct. 1851; *see also Greenpeace Action v. Franklin*, 14 F.3d 1324, 1330 (9th Cir.1992). Pursuant to this deferential standard, reviewing courts should not substitute their judgments for those of an agency as to the environmental consequences of its actions. *Kleppe v. Sierra Club*, 427 U.S. 390, 410, n. 21, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976).

The applicable standard for reviewing a summary judgment motion is unambiguously stated in Rule 56(c) of the Federal Rules of Civil Procedure:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Summary judgment may be entered only where there is no genuine issue of material fact. *Twiss v. Kury*, 25 F.3d 1551, 1554 (11th Cir.1994). The moving party has the burden of meeting this exacting standard. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). An issue of fact is "material" if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case. *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir.1997). It is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party. *Id.*

In applying this standard, the district court must view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion. *Id.* However, the nonmoving party:

> may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

Fed.R.Civ.P. 56(e). "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In other words, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In determining whether this evidentiary threshold has been met, the trial court "must view the evidence presented through the prism of the substantive evidentiary burden" applicable to the particular cause of action before it. *Anderson*, 477 U.S. at 254, 106 S.Ct. 2505. Summary judgment may be granted if the nonmovant fails to adduce evidence which, when viewed in a light most favorable to him, would support a jury finding in his favor. *Id.* at 254–55, 106 S.Ct. 2505.

Additionally, the nonmoving party must "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial and requires the court to grant the motion for summary judgment. *Id.* "The summary judgment standard is particularly appropriate in cases in which the court is asked to review . . . the decision of a federal administrative agency." *Florida Fruit & Vegetable Ass'n v. Brock*, 771 F.2d 1455, 1459 (11th Cir.1985) (internal citations omitted). In cases such as this, the application of the "arbitrary and capricious" standard to the Corps' conclusions in view of the facts in the administrative record raises legal questions, not factual ones.

### III. NEPA (Count I)

The Plaintiff claims that it is entitled to summary judgment on Count I for nine reasons, all stemming from Defendants' alleged violation of the National Environmental Policy Act ("NEPA").

■ NEPA is the self-proclaimed "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). The stated goal of the NEPA process is "to help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment." 40 C.F.R. § 1500.1(c). Specifically, it "imposes procedural requirements upon federal agencies to ensure that they adequately assess the environmental impacts of actions they undertake." *City of Oxford, Georgia v. Federal Aviation Administration*, 428 F.3d 1346, 1352 (11th Cir.2005). NEPA was "designed to insure a fully-informed and well-considered decision but not necessarily a decision this or any other Court would have made had we been members of the decisionmaking unit of the agency." *Florida Wildlife Federation v. Goldschmidt*, 506 F.Supp. 350, 375 (S.D.Fla.1981).

■ Alleged violations of NEPA are to be reviewed under the "arbitrary and capricious" standard set out by the APA. *See Indiana Forest Alliance, Inc. v. United States Forest Service*, 325 F.3d 851, 858 (7th Cir.2003) ("our review of the Forest Service's action under NEPA is governed by the Administrative Procedures Act (APA) . . . Under the APA, courts must set aside agency decisions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law" ") (citations omitted); *Dubois v. U.S. Dep't of Agriculture*, 102 F.3d 1273, 1284 (1st Cir.1996) ("Like NEPA, the CWA does not articulate its own standard of review; therefore the appropriate scope of review for both NEPA claims and CWA claims is the standard set forth in the APA") (citing *Town of Norfolk v. U.S.*

*Army Corps of Engineers,* 968 F.2d 1438, 1445 (1st Cir.1992); *Oregon Natural Resources Council v. U.S. Forest Service,* 834 F.2d 842, 851–52 (9th Cir.1987)); *Florida Keys Coalition, Inc. v. U.S. Army Corps of Engineers,* 374 F.Supp.2d 1116, 1139 (S.D.Fla.2005) ("As with judicial review of other NEPA actions under the APA, the standard of review for determining whether an agency's reliance on a categorical exclusion was proper is the 'arbitrary and capricious' standard"); *Ocean Conservancy v. Evans,* 2003 WL 23358201, *3 (M.D.Fla. Dec.17, 2003) ("The standard of review for claims under the MSA, NEPA, and the APA itself is supplied by the APA, 5 U.S.C. § 706(2)").

### A. Additional Supplemental Environmental Impact Statement

■ Both the Intervenors and the Plaintiff argue that the changes implemented by Alternative 7R were significant and therefore warranted the adoption of an additional supplemental environmental impact statements ("SEIS"). Federal agencies are required to prepare a SEIS if "[t]he agency makes substantial changes in the proposed action that are relevant to environmental concerns" or "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1). In addition to the daunting standard Plaintiff must satisfy here, courts have also recognized a public policy rationale for not requiring an agency to file a supplemental EIS every time a modification is made.

4. The Intervenors astutely recognize that FFWMD's decision to withdraw its approval of Alternative 7, in and of itself, seems to indicate the gravity of the Corps's actions. *See* NRDC Intervenors' Opposition to Miccosukee Tribe of Indians' Motion for Summary Judgment and Intervenors' Cross–Motion for Summary Judgment Against Federal Defendants and Incorporated Memorandum of Law

*See State of California v. Block,* 690 F.2d 753, 771 (9th Cir.1982) (noting that requiring an agency to refile an SEIS each time any changes have been made could make the agency "hostile to modifying the alternatives to be responsive to earlier public comment.") Furthermore, CEQ guidance states that if an agency is presented with an alternative that is a minor variation from the previous version, "the agency should develop and evaluate the new alternative, if it is reasonable, in the final EIS. If it is qualitatively within the spectrum of alternatives that were discussed in the draft, a supplemental draft will not be needed." 46 Fed.Reg. 18026, 18035 (1981). The Intervenors in particular embark on a helpful review of the circumstances surrounding the adoption of Alternative 7R and the features added to Alternative 7R that differ from Alternative 7.

In December 2001, the SFWMD withdrew its approval for Alternative 7, apparently because "Alternative 7 did not provide the same flood control benefit as ISOP . . . ." Briefing Statement on IOP at 1–2. In turn, the SFWMD's decision to withdraw its approval for Alternative 7 led to the adoption of Alternative 7R.[4] All of the parties agree that implementation of Alternative 7R led to the construction of the following features:

- An S–356 Pump Station, located in the northeast corner of the Everglades;

- An S–332C pump station and seepage reservoir, located on the eastern edge of the Everglades;

("Intervenors' Motion"), at 18 ("[I]t is doubtful that the District would have pulled out of an agreement that required an unprecedented effort to craft (the Alternative 7 agreement), risk the political and legal consequences of doing so, and ultimately agree to the new alternative, if it believed the changes involved would not be significant.").

• An S–332B—S–332C connector reservoir, running north from the S–332C reservoir,

• An S–332D seepage reservoir, located south of the S–332C reservoir.

Ulrich Decl., ¶ 10, AR 3666, tab 57.

These structures (the "R Structures") had the effect of doubling the pumping capacity of the SDCS and increasing the existing reservoir capacity tenfold. *See* Fish and Wildlife Coordination Act Report at 19; Ulrich Decl., Gamble Decl. Exh. K at 4–5. The Plaintiff argues that over $30 million was spent to build temporary structures that differentiated Alternative 7R from its predecessor. *See* Plaintiff Miccosukee Tribe's Combined Response to Federal Defendants' Cross–Motion for Summary Judgment and Reply in Support of Tribe's Motion for Summary Judgment ("Pl.Res.") at 18.

The Defendant points out that all of the R. Structures were components of two previously authorized projects: the MWD Project (authorized in 1989) and the C–111 Project (authorized in 1996). *See* Final Fish and Wildlife Coordination Act Report; Central and South Florida Project on Modified Water Deliveries to Everglades National Park; AR 3666, tab 57 ("Construction impacts had been analyzed and approved in prior NEPA documents for MWD and C–111 Projects"). Thus, no additional NEPA analysis was required because "construction and operation of these structural features have already been analyzed in prior NEPA documents." Ulrich Decl., at ¶ 11.

■ The changes implemented by the Corps could hardly be considered insignificant. The scope of the construction itself is vast. Furthermore, as the Intervenors point out, the Corps' argument that construction of the R structures is somehow "pre-approved," or exempt from a NEPA

analysis by the earlier adoption of the C–111 and Modified Water Delivery Projects is unavailing. Projects of this sort are not meant to be instituted piecemeal. The cobbling together of a portion of the C–111 Project, approved ten years ago, and a portion of the MWD Project, approved 17 years ago, to create a modification to a relatively recent water delivery plan is inappropriate. In any event, the actual structures are different—the new S–332B, S–332C and S–332D structures increase pumping capacity by twenty-five percent. Intervenors' Motion, n. 15. Finally, in its Amended BO, the FWS predicated its approval of the R Structures on the assumption that the R Structures would be operated in a manner "consistent with the project purposes as defined for [the Everglades]" by the C–111 Project. *See* Gamble Decl., Ex. O at 8. This is buttressed by statements in the FEIS that required that the use of these new pump stations and reservoirs are consistent with the original guidelines and goals of the C–111 and MWD Projects. *See* DE 3662 at 40–41 ("Operations will be modified as necessary to achieve desired habitat conditions consistent with" the restoration Projects); *id.* at x, 41 ("Normal operations will be targeted to achieve marsh restoration"). According to the Intervenors, consistent with the original guidelines and goals of the C–111 and MWD Projects, means consistent with marsh operational criteria,[5] which the Corps is undisputedly only now beginning to implement.

The Court agrees with the Intervenors and the Plaintiff that the failure of the Corps to prepare a SEIS, with hydrologic modeling results and interpretation of the modeling stemming from the introduction of Alternative 7R, was arbitrary and capricious. Accordingly, for the reason stated

---

5. *See* Section VIII, *infra.*

above, this Court finds that the Defendants violated NEPA. The Court need not consider Plaintiff's additional arguments alleging violations of NEPA at this time.

## IV. ESA (Count II)

 The procedural requirements of the ESA correspond, and overlap, with the procedural requirements of NEPA. *Sierra Club v. U.S. Army Corps of Engineers,* 295 F.3d 1209, 1216 (11th Cir.2002). Challenges brought under either statute are reviewed by the arbitrary and capricious standard, as defined by the Administrative Procedure Act, 5 U.S.C. §§ 701–706. Under this standard, the court gives deference to the agency decision by reviewing for clear error, and by refraining from substituting its own judgment for that of the agency. *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto., Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). However, the court must also look beyond the scope of the decision itself to the relevant factors that the agency considered. *Id.* The Court's duty is to ensure that the agency took a "hard look" at the environmental consequences of the proposed action. *North Buckhead Civic Ass'n v. Skinner,* 903 F.2d 1533, 1541 (11th Cir.1990). This duty requires the court to consider not only the final documents prepared by the agency, but also the entire administrative record. *Mo. Coalition for the Env't v. Corps of Eng'rs of the U.S. Army,* 866 F.2d 1025, 1031 (8th Cir.1989).

The Plaintiff argues that the Defendants violated the ESA because the Corps: (1) did not provide FWS with the 7R modeling, and therefore inappropriately relied on FWS's BO; (2) failed to reinitiate consultation on the impacts of 7R modeling on the habitat of the snail kite after the BO was issued; (3) made an "irreversible commitment of resources" during the consultation process; and (4) failed to demonstrate that it can comply with the terms of the "incidental take statement" for IOP operations.

### A. Failure to Provide Alternative 7R Modeling

In its *NEPA* claim, which Plaintiff largely reiterates here, the Plaintiff argues that the Corps' failure to use Alternative 7R modeling in its FEIS analysis rose to the level of arbitrary and capricious behavior because "there is no doubt that the best science available to determine the impacts of Alternative 7R is the modeling of 7R." Plaintiff Miccosukee Tribe's Motion for Summary Judgment on Counts I, II, III, IV, VIII and IX of Plaintiff's Complaint and Incorporated Memorandum of Law ("Pl.Motion") at 11; Pl. Res. at 14. The multiple adverse effects of Alternative 7R, such as increased flooding and other biological harm, were thus allegedly excluded in the NEPA process. The Defendants respond that it was unable to include preliminary modeling on Alternative 7R in time for inclusion in the IOP FEIS and Record of Decision ("ROD"), and it made an informed decision to implement the IOP without completing the computer modeling on Alternative 7R. *Id.* The Corps notes that its "decision to implement the IOP was informed by, but did not rely solely on, the incomplete results of modeling for Alt. 7R." Federal Defendants' Combined Memorandum in Opposition to Plaintiff's Motion for Summary Judgment and in Support of Cross–Motion for Summary Judgment ("Def.Opp.") at 11. The Corps' urgency in implementing the IOP before the completion of modeling was due to "the onset of the summer rainy season," and the fear that deferral of the decision would "once again pose potential negative impacts on critical habitat for the endangered sparrow." AR 3666 Tab 57, at 4. Finally, Alternative 7R "provides for continuing monitoring of present and future conditions in WCA 3A and other tribal lands by

the Miccosukee Tribe, and incorporates a mechanism for the Plaintiff to make recommendations to the Corps for changed operations if the Plaintiff determines that conditions indicate jeopardy to the health or safety of the Tribe." Def. Opp. at 12.

According to the *ESA,* "each agency shall use the best scientific and commercial data available" to ensure the protection of any endangered or protected species. 16 U.S.C. 1536(a)(2). Similar to its claim alleging a violation of NEPA, the Plaintiff alleges a violation of the *ESA* because the Corps failed to provide completed Alternative 7R modeling to FWS before FWS issued its Final Amended BO. *See* Pl. Res. at 27. The Corps provides a number of defenses to this claim. First, the Corps claims that the Alternative 7 modeling had not yet been completed as of the date of implementation of the IOP. Thus, the FWS's charge to use the "best available data" could not be fulfilled as the FWS is not required to conduct independent studies or await new data. *See* Pl. Motion at 22. Furthermore, the Corps argues that the FWS noted in its Amended BO that although Alternative 7R modeling was not available, it was able to extrapolate from model runs produced for Alternative 7 in its Final Amended BO. AR 3662, at B38–39.

Plaintiff's argument boils down to a complaint that the Corps did not complete modeling quickly enough. Pl. Res. at 28 ("The Corps began modeling in early 2002, so it was not outside the Corps' ability or realm of possibility to complete the modeling"). This may be true, but the Plaintiff has failed to demonstrate that the Corps acted arbitrarily and capriciously for a number of reasons. First, a delay of a few months (if indeed it is the case that the Corps could have completed modeling sooner) hardly rises to arbitrary and capricious behavior that the Plaintiff is required to show. Second, in its Final Amended BO, FWS concluded that "[t]he IOP Alt–7R features and operations have not been modeled, but some extrapolations can be made from model runs produced for IOP Alt.7 ..." AR 3662, at B38–39. The Plaintiff has not shown how, if at all, reliance on these extrapolations was arbitrary and capricious. *Bensman v. United States Forest Service,* on which Plaintiff heavily relies, is inapposite. In that case, the Western District of Missouri held that the Forest Service acted arbitrarily and capriciously in completely ignoring one of the few studies done on the roosting habits of the male Indiana bat. 984 F.Supp. 1242, 1248 (W.D.Mo.1997). Here, however, Alternative 7R modeling had not yet been completed, and FWS even attempted to incorporate an analysis of Alternative 7R by conducting its own extrapolations based on Alternative 7 models. While ESA does require the Corps to provide FWS with the "best available science," "[a]ll that is required of the agencies is to seek out and consider all existing scientific evidence relevant to the decision at hand." *Heartwood Inc. v. U.S. Forest Service,* 380 F.3d 428, 436 (8th Cir.2004). In a challenge to the Environmental Protection Agency's modeling, the D.C. Circuit Court of Appeals held that the EPA, "[p]ossessing imperfect scientific information ... had to decide whether to proceed on that basis or to invest the resources to conduct the perfect study. It chose to do the former. This is the type of decision to which this court will generally apply the deferential standard of 5 U.S.C. § 706(2)(A)." *American Iron and Steel Institute v. E.P.A.,* 115 F.3d 979, 1005 (D.C.Cir.1997). Accordingly, and on the basis of this deferential standard, the Court held that "Petitioners have not demonstrated to us that the agency's explanation is irrational. We therefore reject their contention that use of the model was arbitrary." *Id.* Similarly, the Court finds

that the Corps' decision to proceed with the imperfect information it had should be accorded the appropriate deference. Moreover, as discussed above, it is undisputed that the Corps did not complete modeling on Alternative 7R because of fear of additional damage to the endangered sparrow's habitat. Specifically, the Corps determined that it "cannot defer an IOP decision until more detailed information is available. With the onset of the summer rainy season, deferral of a decision on this matter would likely lead to conditions that would once again pose potential negative impacts on critical habitat for the endangered sparrow." AR 3666, tab 57. Finally, the Corps adopted a number of safeguards in the event of any unforeseen adverse impacts brought on by the implementation of Alternative 7R.

Armed with the information it did have, and taking into account the time constraints imposed by the onset of the rainy season, the Corps did not act arbitrarily or capriciously by relying on the limited modeling information. Thus, the Court agrees with Defendants that the Corps' determination not to postpone the implementation of the IOP was reasonable and that it was not improper for the Corps to rely on FWS's incomplete Alternative 7R modeling.

### B. Failure to Reinitiate Consultation

The Plaintiff next argues that the Corps was required to reinitiate consultation with FWS on the IOP once the 7R modeling was completed. Pl. Motion at 21. According to FWS consultation regulations, reinitiation of consultation is required "[i]f new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered." 50 C.F.R. § 402.16(b).

■ The burden, of course, is on the Plaintiff to make a showing that the Corps acted arbitrarily and capriciously in failing to reinitiate consultation with FWS upon completion of 7R modeling. The Plaintiff provides no information to this Court, however, that indicates what new information was available to the Corps that had not been previously considered, other than to say "7R modeling." The Record makes clear, however, that 7R modeling had at least been *considered* in FWS's BO. Furthermore, the Plaintiff makes no attempt to illustrate how this new modeling information "may affect listed species or critical habitat in a manner or to an extent not previously considered."

### C. Violation of Section 7(d)

■ Section 7(d) of the ESA provides: "After initiation of consultation required under subsection (a)(2) of this section, the Federal agency and the permit or license applicant shall not make any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures which would not violate subsection (a)(2) of this section," Much like its argument alleging a violation of NEPA, the Tribe argues that the Corps improperly "committed resources" during the consultation process, i.e. it began negotiation and execution of contracts relating to construction of certain features of MWD and C–111 Projects. Pl. Res. at 30. As the Corps points out, however, "the *construction* work on the features of the MWD and the C–111 project was not dependent on Alt. 7R, but was fully coordinated and approved by the FWS at the time those projects were approved." Def. Opp. at 24. All discussion concerning the construction of these features had already taken place in the form of a May 1994 Final Integrated General Reevaluation Report and Environmental Impact Statement (AR 645) and the June

1992 General Design Memorandum and Environmental Impact Statement for the Modified Water Deliveries to Everglades National Park project (AR 672). Furthermore, consultation was completed upon the issuance of the BO, which is dated March 28, 2002—the Corps did not begin construction until March 30, 2002. Pl. Motion at 22. The Plaintiff argues that the BO was not transmitted to the Corps until April 2, 2002, two days *after* construction began. Nonetheless, it is apparent that consultation ended when the Amended BO was issued, on March 30, not when it was physically transmitted to the Corps. *See Enos v. Marsh*, 616 F.Supp. 32, 62 (D.Haw.1984) ("Plaintiffs' final argument is that the Corps has violated 16 U.S.C. § 1536(d), which prohibits the Corps from making 'any irreversible or irretrievable commitment of resources' which has the effect of 'foreclosing the formulation or implementation of any reasonable and prudent alternative measures' to protect endangered species. This duty, however, exists only while the Corps is consulting with the Service. This duty is terminated when the consultation is terminated. As noted ... in *Stop H–3 v. Lewis*, 538 F.Supp. 149 (D.Haw.1982), once the Service has issued its biological opinion (as it has done here), no further consultation is required").

### D. Compliance with the Incidental Take

■ Section 9 of the ESA, 16 U.S.C. § 1538(a)(1)(B), prohibits the "take" of any endangered or threatened species in the United States. "Take" is defined as to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture or collect, or attempt to engage in any such conduct. *See* AR 3662, at B57. A taking that is incidental to and not intended as part of the agency action is not considered to be prohibited taking under the ESA, provided that such taking is in compliance with the terms and conditions of the Incidental Take Statement ("ITS") for IOP operations. *Id.* According to the ITS, the water levels in certain parts of the Everglades cannot exceed certain levels. *See* AR 3662, at B58. This requirement is reflected in the ROD, which states that "the Corps should adjust day-to-day operations to reduce durations and depths of high water within the southern and eastern WCA 3A as much as possible without increasing adverse affects to the sparrow." AR 3666, tab 57. Without providing any evidence to meet the difficult burden before it, the Tribe states that the Corps *may not* be fulfilling this requirement of the ITS. Pl. Motion at 23. The Plaintiff has failed to meet its burden of showing that the Corps has acted arbitrarily and capriciously in this regard.

### V. APA (Count III)

■ The Plaintiff's primary claim of an APA violation is improper delegation of authority to the IECR advisory group.[6] According to Plaintiff's statement of facts, a team of federal and non-federal agencies were represented at numerous closed-door meetings facilitated by the United States Institute for Environmental Conflict Resolution. Miccosukee Tribe's Statement of Undisputed Facts Relating to Counts I, II, III, IV, VIII and XI of the Tribe's Complaint ("Pl.Facts"), ¶¶ 100–110. This "team" also had access to a restricted website and attended a retreat. *Id.* While the facts are undisputed with respect to the actions actually taken by the IECR group, the parties engage in a semantical war as to whether the IECR group selected Alternative 7R (and the Corps "rubber-

---

6. In Count IX of its Complaint, Plaintiff alleges a separate "Improper Delegation of Authority" Claim. The legal analysis and facts supporting the allegation in Count IX are identical to those in Plaintiff's APA claim.

stamped" that selection), or whether the Corps took the requisite "hard look" itself after collaboration with the IECR group. Based on the record, and in light of the difficult burden for Plaintiff, the Court finds, for the reasons discussed below, that the Corps properly used the IECR process.

As a preliminary matter, the Court finds that there was nothing inherently improper in using IECR to facilitate the issuance of the IOP FEIS and the corresponding ROD. Indeed, the Council on Environmental Quality ("CEQ"), the agency charged with ensuring that other federal agencies are complying with NEPA, specifically recommended the conflict resolution process that was followed by these Defendants. See 42 U.S.C. § 4244; AR 2434 ("We also recommend that the Corps and other involved federal agencies seek the services of the U.S. Institute for Environmental Conflict Resolution to facilitate improved processes for bringing these matters to closure"). In conclusory fashion, the Plaintiff contends that the IOP EIS advisory group actually made the ultimate decision, but it cites to no section of the administrative record to support this claim. Rhetoric aside, Plaintiff's own undisputed statement of facts touts that the purpose of the IOP EIS group's meeting was to "recommend" an IOP alternative. See Pl. Facts ¶ 108. Moreover, the rather exhaustive procedure followed by the Defendants belies Plaintiff's argument that the Corps merely "rubber-stamped" the recommendation of the IECR. After the Corps issued a draft EIS in early 2001, the Corps determined that a round of mediation before the IECR would be helpful in light of public reaction to the DEIS. Compl. ¶ 33. This led to the issuance of a supplemental DEIS, which was released in October 2001. Id. at ¶ 35. Comments to the SDIES led to another round of mediation, where Alternative 7R was finally chosen. Id. at ¶ 36. Based on this record, the Court cannot find that the Corps, after two rounds of mediation and three rounds of public comment, merely rubber-stamped the decision of the IECR. Furthermore, Plaintiff's statement that 5 U.S.C. § 572(b) restricts the use of a dispute resolution proceeding if "the matter significantly affects persons or organizations who are not parties to the proceeding" is simply an incorrect reading of the statute, which prefaces that subsection with the statement "[a]n agency shall consider not using a dispute resolution proceeding if . . . ." See Pl. Res. at 9. Accordingly, this Court cannot find that the Corps' use of the IOP EIS advisory group was "arbitrary and capricious."

Plaintiff further suggests that the use of the IECR was improper because the APA "prohibits ex parte communications to ensure that agency decisions, required to be made on an open public record, are not influenced by private off-the-record communications from those personally interested in the outcome." Pl. Motion at 24. In support of this contention, the Plaintiff cites to a Ninth Circuit case that prohibits ex parte communications "when a hearing is required to be conducted in accordance with Section 556" of the APA. See Portland Audubon Soc. v. Endangered Species Committee, 984 F.2d 1534, 1540 (9th Cir. 1993). The Plaintiff has made no showing that a hearing was required in this case under Section 556 of the APA.

█ The Plaintiff next complains that the Corps failed to release preliminary Alternative 7R modeling before the issuance of the FEIS. The Plaintiff cites to no authority that stands for the proposition that the Corps was required to submit preliminary modeling before the analysis was completed. Indeed, it would set a troublesome precedent to allow and indeed encourage a federal agency to release find-

ings (that may be erroneous) before modeling is complete.

Plaintiff's final argument that the Administrative Record is incomplete because it "does not contain minutes of every private meeting, and phone call" is similarly without merit, as the Plaintiff has not even shown that these minutes exist.

## VI. Failure to Conduct Rulemaking (Count IV)

The Plaintiff argues that "[t]here is no evidence in the record that [the public involvement] procedures were properly applied in the development of the IOP." Pl. Motion at 26. Specifically, the Plaintiff contends that the Defendants did not comply with the notice and comment provisions of the APA. Pl. Res. at 31, Compl. Count IV. The crux of this issue is whether the IOP is considered a "new" Water Control Plan, or was it merely a decision to deviate from the original Plan—a deviation that is permissible under the terms of the Plan itself. If the IOP is considered a new "rule" or even an amendment of the Water Control Plan, then it is subject to the administrative requirements of 5 U.S.C. § 552(a)(1), or 5 U.S.C. § 553.[7] The Corps further argues that even if the IOP were a new rule, it would be an interpretive "non-legislative" rule that is not subject to the notice and comment requirements of § 553.

A "rule" is "the whole or part of an agency statement of general or particular applicability and future effect designed to implement, interpret or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency ...." 5 U.S.C. § 551(4). Rule making is the "agency process for formulating amending, or repealing a rule." 5 U.S.C. § 551(5).

According to the Water Control Plan, deviation from the normal regulation is permitted. See AR 648, at 7–14, 7–15. As the Corps points out, if all deviations from the Water Control Plan are treated as "rules" as the Plaintiff suggests should be done, the Corps would be completely hamstrung to actually initiate or act on any of its permissible deviations (especially emergency deviations) in a timely manner. In fact, the Water Control Plan suggests the exact opposite in the event of emergency deviations, requiring the Corps to inform the District Office of this deviation "as soon as practicable." AR 648 at 7–14. The Tribe itself has even requested emergency action on at least two prior occasions. See AR 599; Miccosukee Tribe v. United States, 980 F.Supp. at 457. Yet a thirty-day delay is required before action can be taken if the deviation is to be treated as the implementation of a new rule. See 5 U.S.C. § 553(d). To treat these deviations as "rule making" would be, at the very least, inconsistent with the spirit of the Plan as well as the expectations of the Tribe prior to the commencement of this action. In any event, this Court has previously held that the water regulation schedules are guidelines, thus "the Corps can deviate from a water regulation schedule if appropriate." Lake Worth Drainage Dist. v. Caldera, et al., Case No. 96–8827–CIV–GOLD (Oct. 7, 1998 Order Granting Summary Judgment in Favor of Defendant). The Water Control Plan regulation schedules are continually referred to as providing "guidance," and were written with flexibility in mind. AR 648, at 7–2, 7–7 ("When water levels fall below the minimum levels, transfers from Lake Okeechobee or the WCA's are made to meet water supply demands," "It is anticipated that, as more data is collect-

---

**7.** The Corps claims that even if the Water Control Plan is considered a "legislative rule," it properly complied with § 553.

ed through the experimental program, improvements in the operation of the system can be made;" "Average monthly flows ... are subject to the availability of water in the system"). Thus, the Court agrees with the Defendants that the alteration of the water regulating schedules by the IOP was not an amendment to the Plan and not subject to the rule making provisions of the APA.

## VII. Federal Advisory Committee Act (FACA) (Count VIII)

"Through the passage of FACA, Congress sought to recognize the importance of having advisory committees to the Executive Branch be completely open to public observation and comment." *Alabama–Tombigbee Rivers Coalition v. Dep't of Interior*, 26 F.3d 1103, 1106 (11th Cir. 1994). Under FACA, "[t]he requirements advisory committees have to meet include filing a detailed charter, giving advance notice in the Federal Register of any meetings, generally holding open meetings, having an officer or employee of the federal government preside over or attend every meeting, making records available to the public, and if the committee is established by legislation or created by the President or other federal official or agency, being 'fairly balanced in terms of the points of view represented and the functions to be performed' and not being 'inappropriately influenced by the appointing authority or by any special interest.'" *Miccosukee Tribe of Indians of Florida v. Southern Everglades Restoration Alliance*, 304 F.3d 1076, 1082 (11th Cir.2002) (quoting 5 U.S.C.App. 2 §§ 5, 9, 10).

▮ It is undisputed that if the IECR is subject to FACA, there is a FACA violation. The question is whether the IECR was subject to FACA at all. The Corps first argues that "the mediation pro-

cess was not an 'advisory committee' governed by FACA ...." Federal Defendants' Reply Memorandum in Support of Cross–Motion for Summary Judgment ("Def.Reply") at 16. An "advisory committee" is defined as "any committee ... which is established or utilized by one or more agencies in the interest of obtaining advice or recommendations for the President or one or more agencies or officers of the Federal Government, except that such term excludes (1) any committee that is composed wholly of full-time, or permanent part-time, officers or employees of the Federal Government." § 3, 5 U.S.C.A.App. 2. The Corps primarily argues that it did not "establish" the mediation process or "utilize" the IECR group.

▮ "In order for a committee to be established by an agency, it must be 'directly established' by the agency." *People for the Ethical Treatment of Animals, Inc. v. Barshefsky*, 925 F.Supp. 844, 848 (D.D.C.1996); *Physicians Committee for Responsible Medicine v. Horinko*, 285 F.Supp.2d 430, 443 (S.D.N.Y.2003) (same). The Supreme Court has "squarely rejected an expansive interpretation of the words, reading 'established' and 'utilized' narrowly to prevent FACA from sweeping more broadly than Congress intended." *Byrd v. EPA*, 174 F.3d 239, 245 (D.C.Cir.1999) (citing *Public Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 461, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989)). The IECR is a Congressionally created group designed to resolve environmental disputes. 20 U.S.C.A. § 5604(8). Based on the allegations of the Complaint and the administrative record, it is clear that the conflict resolution group at issue here was orchestrated and created by IECR, and recommended by CEQ.[8] *See* Compl. ¶ 33 (meeting "conducted" by IECR); AR 2434 (CEQ "recommend[s]

---

**8.** The Court notes that the IECR was "engaged" by the Corps. *See* AR 2567 at 1. The

Court does not equate "engagement" to "establishment" for the purposes of FACA.

that the Corps and other involved federal agencies seek the services of the U.S. Institute for Environmental Conflict Resolution to facilitate improved processes for bringing these matters to closure"). The Court agrees with the Defendant that "[b]ecause the Corps did not conceive of the conflict resolution process or group, or select its own membership of the group, the Tribe cannot show that the Corps established the group." Def. Opp. at 34.

"[U]tilized encompasses a group organized by a nongovernmental entity but nonetheless [is] so closely tied to an agency as to be amenable to strict management by agency officials." *Aluminum Co. of Amer. v. National Marine Fisheries Service*, 92 F.3d 902, 905 (9th Cir.1996) (quoting *Food Chem. News v. Young*, 900 F.2d 328, 332–33 (D.C.Cir.1990)) (internal quotations omitted). Furthermore, "the utilized test is a stringent standard, denoting 'something along the lines of actual management or control of the advisory committee.'" *Animal Legal Defense Fund v. Shalala*, 104 F.3d 424, 430 (D.C.Cir.) (quoting *Washington Legal Found. v. Sentencing Comm'n*, 17 F.3d 1446, 1450 (D.C.Cir.1994)). "[P]articipation by an agency or even an agency's 'significant influence' over a committee's deliberations does not qualify as management and control such that the committee is utilized by the agency under FACA." *Byrd v. U.S. E.P.A.*, 174 F.3d 239, 245 (D.C.Cir.1999). The Corps did not control or otherwise "actually manage" the IECR. Indeed, according to the Interagency Agreement, "the Corps shall have no right to any confidential information obtained or generated by the Institute in connection with" the mediation services, and the Corps was required to acknowledge that "the Institute is not acting as an agent of the Corps, and the Corps shall cooperate with the Institute as needed to maintain the Institute's impartiality." AR 2567, at 2–3. Accordingly, the Court finds that the IECR mediation process did not constitute an "advisory committee" under FACA. Thus, FACA is inapplicable and the Court will not consider Defendant's remaining arguments for summary judgment on Count VIII at this time.

*VIII. Intervenors' Cross–Claims*

■■■ Intervenors predicate subject matter jurisdiction on the relief sought under the Declaratory Judgment Act. *See* Cross–Claim, ¶ 1 ("This is an action for declaratory judgment under 28 U.S.C. §§ 2201 and 2202"). In all cases arising under the Declaratory Judgment Act, 28 U.S.C. § 2201 (1988), the threshold question is whether a justiciable controversy exists. *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 272, 61 S.Ct. 510, 85 L.Ed. 826 (1941); *United States Fire Ins. Co. v. Caulkins Indiantown Citrus*, 931 F.2d 744, 747 (11th Cir.1991) (citations omitted). Congress limited federal jurisdiction under the Declaratory Judgment Act to actual controversies, in statutory recognition of the fact that federal judicial power under Article III, Section 2 of the United States Constitution extends only to concrete "cases or controversies." *See Tilley Lamp Co. v. Thacker*, 454 F.2d 805, 807–08 (5th Cir.1972).

■■■ 28 U.S.C. § 2201(a) provides, in relevant part:

> In a case of actual controversy within its jurisdiction, ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought ....

"Whether such a controversy exists is determined on a case-by-case basis." *Caulkins Indiantown Citrus*, 931 F.2d at 747; *see also BP Chemicals v. Union Carbide Corp.*, 4 F.3d 975, 977–78 (Fed.Cir.1993)

(stating that difference between "definite and concrete" dispute and case not ripe for litigation is one of degree, determined by totality of circumstances). The controversy must be more than conjectural; the case must "touch[ ] the legal relations of parties having adverse legal interests." *Caulkins Indiantown Citrus*, 931 F.2d at 747 (quoting *Brown & Root, Inc. v. Big Rock Corp.*, 383 F.2d 662, 665 (5th Cir. 1967)); *see also Halder v. Standard Oil Co.*, 642 F.2d 107, 110 (5th Cir.1981) (stating that district courts lack jurisdiction to express legal opinions based on hypothetical or academic facts).

> For a controversy to exist, the facts alleged, under all the circumstances, [must] show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment. The party who invokes a federal court's authority must show, at an irreducible minimum, that at the time the complaint was filed, he has suffered some actual or threatened injury resulting from the defendant's conduct, that the injury fairly can be traced to the challenged action, and that the injury is likely to be redressed by favorable court disposition.

*Atlanta Gas Light Co. v. Aetna Casualty & Sur. Co.*, 68 F.3d 409, 414 (11th Cir. 1995) (internal citations and quotations omitted). Furthermore, "[a]bsent a redressable injury a judicial determination of plaintiff's claim would amount to an advisory opinion prohibited by Article III's case and controversy requirement." *Glen v. Club Mediterranee, S.A.*, 365 F.Supp.2d 1263, 1272 (S.D.Fla.2005) (citing *Church v. City of Huntsville*, 30 F.3d 1332, 1335 (11th Cir.1994)). "While the Declaratory Judgment Act confers upon a court the power to "declare the rights and other legal remedies of any interested party seeking such declaration, whether or not further relief is or could be sought, 22 U.S.C. § 2201, it does not authorize this Court to issue an advisory opinion regarding a defendant's alleged violation of a federal statute." " *Id.* at 1272–73.

The Intervenors seek one remedy in this action: expeditious implementation of the so-called "marsh operational criteria." *See* Intervenors' Motion, at 36 ("the Court should grant Intervenors' Cross–Motion, and require Federal Defendants to expeditiously implement the marsh operational criteria"); NRDC Intervenors/Cross–Plaintiffs' Corrected Combined Memorandum in Further Support of Motion for Summary Judgment and in Opposition to Federal Defendants' Cross–Motion for Summary Judgment ("Intervenors' Opp.") at 44 ("For the foregoing reasons, Intervenors request that the Court declare the Federal Defendants to be in violation of the ESA, CWA, WRDA and APA, and require Federal Defendants to implement the marsh operational criteria by February 2006"). The Intervenors argue that the U.S. Fish and Wildlife Service presumed, and indeed premised their approval of Alternative 7R as an additional RPA on, the implementation of marsh operational criteria. Marsh operational criteria, according to the Intervenors, require maintaining the water levels in the reservoirs high enough to decrease seepage to the east, but not high enough to result in reverse flow of polluted water into the Everglades during storms. Intervenors' Opp. at 12–13. *See also,* Amended BO at 35 ("Furthermore, in order to qualify as a substitute for the water management provision of the February 1999, biological opinion, RPA, IOP–Alt. 7R must be implemented as described in the Interim Operation Plan—Final Recommended Plan (Table 1) . . ."). That table, according to the Intervenors, includes the marsh operational criteria for the "new" Alternative 7R structures. The failure to implement the marsh operational criteria has led to,

among other thing, an increase in phosphorus pollution in the Everglades and a decrease in the Sparrow population.

The Corps has indicated multiple times that it is in the process of implementing the marsh operational criteria in a timeframe to be determined. *See* Declaration of Kimberly A. Taplin (detailing steps taken by the Corps to implement the marsh operational criteria); Federal Defendants Combined Memorandum in Opposition to Intervenors' for Summary Judgment and in Support of Cross–Motion for Summary Judgment ("Def. Response to Intervenors") at 11 ("The Corps will take the appropriate steps to implement marsh operational criteria when they are agreed upon through this interagency modeling process"); *id.* at 29 ("the Corps has been actively working with FWS to develop specific criteria to replace the default 2–foot criteria"); Defendants' Reply Memorandum in Support of Cross–Motion for Summary Judgment ("Def. Reply to Intervenors") at 1 ("The U.S. Army Corps of Engineers is acting in accordance with the terms of the Interim Operating Plan Final Environmental Impact Statement and Amended Biological Opinion by following the default marsh operational criteria as it works with the U.S. Fish and Wildlife Service, the National Park Service, and other stakeholders to identify possible refinements to the default criteria").

The record in this case is voluminous. At no point, however, did the Intervenors seek expedited consideration of its motion for summary judgment, which became ripe for review in November 2005. The remedy the Intervenors seek—implementation of the marsh operational criteria by February 2006—is now moot. "[A] case is moot when it no longer presents a live controversy with respect to which the court can give meaningful relief. If events that occur subsequent to the filing of a lawsuit or an appeal deprive the court of the ability to give the plaintiff or appellant meaningful relief, then the case is moot and must be dismissed." *Florida Public Interest Research Group Citizen Lobby, Inc. v. Environmental Protection Agency,* 386 F.3d 1070, 1086 (11th Cir.2004) (citing *Al Najjar v. Ashcroft,* 273 F.3d 1330, 1335–36 (11th Cir.2001)). *See also Arizonans for Official English v. Arizona,* 520 U.S. 43, 68, n. 22, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997) ("Mootness has been described as 'the doctrine of standing set in a time frame. The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)' ") (internal citations omitted).

If this Court were to declare that the Defendants violated the ESA, CWA, WRDA and APA, the only conceivable remedy—indeed the only remedy sought by Intervenors—is implementation of marsh operational criteria. The Corps, of course, is in the process of implementing the marsh operational criteria. Thus, there is no "meaningful relief" that this Court can provide. Any order by this Court granting Intervenors' Cross–Claims would amount to an advisory opinion. "If the court cannot relieve the harm of which a plaintiff complains, the court should not take the case; in the absence of an effective remedy its decision can amount to nothing more than an advisory opinion." *Wymbs v. Republican State Executive Committee of Florida,* 719 F.2d 1072, 1085 (11th Cir.1983). Furthermore, the Court is unaware of how far along the Corps is in this implementation or what the precise timetable is for the implementation. Thus, although the Intervenors argue that the Corps must expeditiously implement the marsh operational criteria, the Court is unable at this point to find that the Corps' delay in implementing the marsh operational criteria (which the Intervenors admit were scheduled to first be agreed upon

in November 2005) is in some way unwarranted. Indeed, the Court has no indication as to what progress, if any, has been made in the past few weeks regarding implementation. Intervenors' entire motion seems to rely on statements by an employee of FWS who stated that she believes that the marsh operational criteria agreed upon in November 2005 will not be implemented under IOP. *See* Nehler Depo. at 48:22–24. Thus, any delay is merely hypothetical at this point, not actual.

### IX. Remedies

The Intervenors argue that the remedy sought by the Tribe would undo the protections essential to the continued existence of the Sparrow. Intervenors' Motion, at 2. This Court previously adopted Magistrate Judge O'Sullivan's finding that "enjoining the IOP and returning to Test 7 operating conditions that gave rise to the development of the IOP would risk returning the Sparrow to its jeopardy status." DE # 141. This finding is of course consistent with the finding of FWS that the continuance of Test 7, Phase I operations "is likely to jeopardize the continued existence of the Cape Sable seaside sparrow and adversely modify its critical habitat." AR 223, at 77; Fish & Wildlife Coordination Act Report, at 18–19. It would seem inconsistent, at the least, to now adopt the Tribe's proposed remedy and order the discontinuance of the IOP.

It is clear to this Court that the Corps violated NEPA by failing to issue a SEIS after adopting Alternative 7R. Accordingly, the Corps must issue a Supplemental Environmental Impact Statement no later than May 15, 2006. Furthermore, and also in furtherance of the goals touted by NEPA and keeping in mind the ESA's charge that every agency must "insure that any action authorized, funded or carried out by such agency . . . is not likely to jeopardize the continued existence of any [listed species] or result in the destruction or adverse modification of" designated critical habitat, the Corps is ordered to file a supplemental brief on (1) its definition of "marsh operational criteria;" (2) its progress in implementing the "marsh operational criteria;" and (3) a proposed timeline to complete implementation of the marsh operational criteria. The Corps is directed to file this brief no later than April 24, 2006. Both Intervenors and Plaintiff may respond to Defendants' brief on or before May 15, 2006. In these responses, the Intervenors and Plaintiff may raise the prospect of additional remedies, such as the reinitiation of consultation with FWS on IOP, or any other remedies as they see fit.

### X. Conclusion

Based on the foregoing, it is

ORDERED AND ADJUDGED that Plaintiff Miccosukee Tribe's Motion for Summary Judgment on Counts I, II, III, IV, VIII and IX of Plaintiff's Complaint and Incorporated Memorandum of Law (DE # 163) is GRANTED IN PART. Summary judgment is GRANTED with respect to Count I of Plaintiff's Complaint and DENIED with respect to all remaining counts. It is further

ORDERED AND ADJUDGED that Federal Defendants' Combined Memorandum in Opposition to Plaintiff's Motion for Summary Judgment and in Support of Cross–Motion for Summary Judgment (DE # 167) is GRANTED IN PART. Summary judgment is GRANTED with respect to Counts II, III, IV, VIII and IX of Plaintiff's Complaint and DENIED with respect to Count I. It is further

ORDERED AND ADJUDGED that NRDC Intervenors' Opposition to Miccosukee Tribe of Indians' Motion for Summary Judgment and Intervenors' Cross–Motion for Summary Judgment Against Federal Defendants and Incorporated

Memorandum of Law (DE # 172) is DENIED. It is further

ORDERED AND ADJUDGED that Federal Defendants' Combined Memorandum in Opposition to NRDC Intervenors' Motion for Summary Judgment and in Support of Cross–Motion for Summary Judgment on Intervenors' Cross–Claims (DE # 188) is GRANTED. It is further

ORDERED AND ADJUDGED that, in light of this Court declining to reach the merits of Intervenors' CWA Claim, Plaintiff Miccosukee Tribe's Motion to Strike Defendants' Exhibit 6 and Arguments Based on it and Incorporated Memorandum of Law (DE # 227) is DENIED AS MOOT. It is further

ORDERED AND ADJUDGED that, consistent with this Order, the Corps shall issue a Supplemental Environmental Impact Statement no later than May 15, 2006. It is further

ORDERED AND ADJUDGED this Court will reserve jurisdiction to determine the applicable remedies for a period of six (6) months.